David L. HART & Ann
B. Hart, Appellees,

v.

James P. ARNOLD, Appellant.

Superior Court of Pennsylvania.

Argued Feb. 10, 2004.
Filed Sept. 23, 2005.

Jason J. Legg, Montrose, for appellant.

Charles M. Watkins, Reading, for appellees.

BEFORE: LALLY–GREEN, GANTMAN, and CAVANAUGH,* JJ.

* Judge Cavanaugh did not participate in this decision.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, James P. Arnold, appeals from the judgment entered in the Susquehanna County Court of Common Pleas in favor of Appellees, David L. Hart and Ann B. Hart, in his action for breach of contract and related claims. Appellant asks us to determine whether the trial court erred when it denied him any relief on his breach of contract claim on the ground of mutual mistake of fact, and when it dismissed his claims for fraud, punitive damages, and counsel fees. We hold that the court erred when it excused Appellees from contractual liability on the ground of mutual mistake of fact. We further hold that the court properly dismissed Appellant's fraud and punitive damages claims. Finally, we remand the matter for further proceedings regarding damages on Appellant's breach of contract claim and his claim for counsel fees. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶ 2 The relevant facts and procedural history of this case are as follows. In 1986, Appellees initiated efforts to obtain approval to construct, operate, and maintain a dam on their property. The purpose of the dam was to create a lake by impounding water from a branch of Pettis Creek in Bridgewater Township, Susquehanna County, Pennsylvania.

¶ 3 Appellees obtained a permit from the Pennsylvania Department of Environmental Regulation ("DER") to construct the impoundment. The DER permit also required approval from the Army Corps of Engineers ("ACE"). The DER permit was valid until December 31, 1988. The ACE permit was also valid for only two years, but ACE did not communicate this fact to Appellees until 1990.

¶ 4 After a site inspection of Appellees' property in May 1990, ACE informed Appellees that their 1986 ACE Permit had expired on August 29, 1988. Further, Ace informed Appellees their project involved work beyond that permitted under nationwide authorization, and Appellees would have to apply for an individualized permit in accordance with current regulations. Appellees took the position that their 1986 ACE permit was still valid. Nevertheless, Appellees applied for an individualized permit to create the impoundment. In July 1990, ACE notified Appellees that their application was incomplete in many respects. Further, ACE told Appellees that, prior to any approval, certain wetland impact studies had to be performed. Despite their ongoing dispute with ACE over the validity of the 1986 permit, Appellees expressed their intention to continue work on the dam in October 1990. In November 1990, a public notice and comment period was held, which gave rise to certain environmental issues ACE believed needed to be addressed before the dam could be finished and impoundment of the lake could begin. For the first time, ACE began to consider a reduction in the size of the impoundment to meet negative comments from various environmental agencies, particularly with respect to the degradation of surrounding wetlands. ACE told Appellees to complete their reapplication and to submit alternative plans for a smaller impoundment. Appellees did not comply.

¶ 5 In December 1991, ACE informed Appellees that their incomplete application was deemed withdrawn due to their inaction and their failure to submit alternative plans for a smaller impoundment. Appellees' immediate response was to reiterate that their ACE permit was still valid, a position Appellees continued to maintain through 1993.

¶ 6 In February 1993, Appellees entered into an agreement with Appellant, where-

by the parties agreed that Appellant would transfer 55 acres of real property to Appellees in exchange for $125,000.00 and Appellees' promise to create a 20.8 acre lake by constructing a dam of sufficient size and strength to allow for flaring out the proposed impoundment on Appellant's land as contemplated by the parties. Appellees agreed to undertake the costs and responsibility for construction of a dam, on land owed by them and for obtaining all approvals required by government agencies. (*See* Agreement for the Sale of Real Estate, attached as Exhibit A to Appellees' Original Complaint against Appellant, filed 9/1/95, ¶¶ 4, 5; R.R. at 11a–17a).

¶ 7 By virtue of their agreement, the parties intended to create lakefront acreage on their adjacent properties with a reciprocal easement. The area and depth of the lake were essential to the parties' agreement, because (1) a smaller lake would not reach the intended shoreline and (2) the depth of the lake was essential to the type of recreational water activities that could be enjoyed by potential consumers of the lakefront property (such as swimming, fishing, and recreational boating). (*See* Trial Court Opinion, filed July 11, 2002, at 1). Closing occurred on April 2, 1993. Pursuant to the parties' agreement, at closing, $25,000.00 of the sale price was put in an interest-bearing escrow account and earmarked for the construction of the dam. "The intent of the parties was to have lakefront property on their adjacent real property by virtue of a Reciprocal Easement Agreement." (*Id.*)

¶ 8 Later that month Appellant contacted ACE to determine the status of Appellees' permit. ACE informed Appellant that Appellees had taken no action on their reapplication for a permit and it had been deemed withdrawn. On May 15, 1993, Appellant reiterated to Appellees in writing that the $25,000.00 held in escrow was to be used only for construction of a dam for a 20.8 acre lake. Subsequently, Appellees informed Appellant by letter that he needed to move certain power lines on his property to facilitate completion of the project.

¶ 9 In June 1993, Appellant again contacted ACE. ACE informed Appellant that Appellees' project was not authorized, and if construction were actually taking place, then the ACE enforcement division would have to get involved. Over the course of the next few months, ACE sent several cease-and-desist letters to Appellees concerning the construction of the impoundment and the status of their permit. A letter ACE sent to Appellees in July 1993 not only reissued earlier warnings but also stated a meeting would be scheduled between ACE and Appellees to discuss ACE's position regarding the permit and the impoundment.

¶ 10 In September 1993, Appellees and their attorney met with representatives of ACE and the U.S. Attorney's Office. The U.S. Attorney informed Appellees that he was considering an injunction to prevent completion of the project. Following their meeting, Appellees agreed not to complete the project until the permit process was concluded. At that time, Appellees also agreed to consider other project options to avoid degradation of wetlands, namely a reduction in the size of the impoundment. After the meeting, Appellees filed a new permit application for a 12.4 acre impoundment at 1500.57 feet. Appellant was not consulted about this reduction in size. ACE held another notice and comment period in November 1993 for an impoundment of only 12.4 acres.

¶ 11 In January 1994, ACE offered Appellees two options, neither of which was sufficient to satisfy the original agreement between the parties. In June 1994, ACE issued a permit for a 12.4 acre impound-

ment at 1500.57 feet. Appellees constructed a dam utilizing Appellant's funds and created a 12.4 acre impoundment.[1]

¶ 12 Nevertheless, between June and November 1994, Appellees' counsel continued to send letters to Appellant stating that Appellant's failure to move certain utility poles was the sole obstacle to the construction of the 20.8 acre lake as contemplated by the parties' agreement. In November 1994, Appellees' attorney sent another letter to Appellant regarding removal of the utility poles so that the impoundment as originally contemplated could be created. A month later Appellees' attorney threatened legal action if Appellant did not move the designated utility poles.

¶ 13 Appellees finally sued Appellant on September 1, 1995, alleging claims for breach of contract (based on Appellant's failure to move certain utility poles), fraud (based on Appellant's promise to move the utility poles), punitive damages, damages for "inconvenience and aggravation," and counsel fees. In Count I (Breach of Contract), Appellees averred the parties had entered into an agreement for the creation of an "approximately twenty acre impoundment of water, on land owned by the parties;" Appellees further averred, "[Appellees] agreed to undertake the costs and responsibility for construction of a dam, on land owned by [Appellees] and of obtaining all approvals required by government agencies." (Appellees' Complaint, filed 9/1/95, ¶¶ 4–5; R.R. at 2a–3a).

¶ 14 Appellant filed preliminary objections. Following briefing and oral argument, the court sustained Appellant's preliminary objections to the extent that Appellees' claims for attorney fees, damages for "inconvenience and aggravation," and punitive damages were stricken. Appellees were allowed to proceed on their remaining claim for breach of contract and special damages. The court's order was dated January 23, 1996 and filed on January 24, 1996.

¶ 15 Appellant duly filed an answer to the remaining counts of the complaint, with new matter and counterclaims. Appellant's counterclaims alleged breach of contract, diminished value of his land as a result of Appellees' creation of a significantly smaller 12–acre impoundment, fraud, ejectment, monetary losses (including those Appellant incurred as a result of having already moved some of the utility poles), counsel fees and costs.

¶ 16 Appellees filed their answer with new matter to Appellant's counterclaims on February 27, 1996. Curiously, Appellees denied that the parties had ever contemplated an impoundment of any specific size or that Appellees had unilaterally downsized the impoundment. Instead, Appellees maintained the agreement contemplated that the actual area of the impoundment would depend on what ACE would ultimately allow. Appellees further contended the only obstacle to construction of the impoundment as agreed was Appellant's failure to relocate the utility lines.

¶ 17 Appellant filed a reply to Appellees' new matter, denying any contractual duty to relocate utility lines. By agreement of the parties, on May 13, 1996, Appellant filed an amended answer with new matter and counterclaim to include additional money damages, without any change to the theory of his original counterclaims. Throughout the remainder of 1996 and into

---

1. Evidence at trial indicated the dam was constructed at a height of 1505.1 feet and the actual impoundment is approximately 14.8 acres. Even at this size, Appellant maintained the impoundment does not benefit his property, and the impoundment might be subject to reduction as it exceeds the permit specifications.

1997, discovery ensued. The matter was continued indefinitely in 1997, due in part to Appellees' bankruptcy filing. The bankruptcy proceedings were resolved on January 22, 1999.

¶ 18 In August 2000, the court notified the parties of its intent to discontinue the matter due to lack of significant docket activity. By order dated November 6, 2000, and filed November 8, 2000, the case was relisted for trial. Trial was eventually scheduled for October 22, 2001.

¶ 19 On October 12, 2001, the parties deposed Dr. Thomas G. Pluto, Ph.D., a biologist and employee of ACE. In his deposition, Dr. Pluto stated that rerouting the utility poles was irrelevant to the size of the impoundment. Following this deposition, Appellees withdrew their complaint against Appellant on October 16, 2001. Appellant's counterclaims, however, proceeded on two non-consecutive days of trial, after which the parties filed post-trial briefs.

¶ 20 By order dated July 9, 2002 and filed July 11, 2002, the court granted Appellant relief on his ejectment claim and ordered Appellees to remove the fence placed on Appellant's property within 60 days. The court further ordered Appellees to pay Appellant the sum of $25,000.00 from the escrow account, plus interest from 5/13/93, for the unauthorized use of the escrow funds. With the exception of the ejectment action and the unauthorized use of the escrow money, the court ruled that all other expenses and damages Appellant alleged were the result of a mutual mistake; and, the parties were to bear their own expenses and damages, including legal fees.

¶ 21 On July 22, 2002, Appellees timely filed post-verdict motions requesting relief from the court's order directing them to pay Appellant $25,000.00 plus interest for the unauthorized use of the escrow funds. Appellant also timely filed post-verdict motions requesting relief on his claims of breach of contract, fraudulent inducement, fraud, punitive damages, and attorney's fees and costs. On May 12, 2003, the trial court filed its opinion and order dated May 6, 2003, granting Appellees' motion for post-verdict relief and vacating that part of the court's July 2002 order in which the court ordered Appellees to pay Appellant the $25,000.00 held in escrow plus interest since 1993. The court further denied Appellant's motion for post-verdict relief. On June 11, 2003, Appellant filed his notice of appeal.[2] By order dated June 17, 2003, and filed on June 19, 2003, the trial court ordered Appellant to file a Rule 1925(b) concise statement of matters complained of on appeal. Appellant filed his Rule 1925(b) statement on June 27, 2003.

2. Ordinarily, an appeal properly lies from the entry of judgment, not from the order denying post-trial motions. *See generally Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 441 Pa.Super. 281, 657 A.2d 511, 516 (1995) (stating appeal to Superior Court lies from judgments entered subsequent to trial court's disposition of post-verdict motions, not from order denying post-trial motions). A final judgment entered during the pendency of an appeal is sufficient to perfect appellate jurisdiction. *Drum v. Shaull Equipment and Supply, Co.*, 787 A.2d 1050 (Pa.Super.2001), *appeal denied*, 569 Pa. 693, 803 A.2d 735 (2002). Here, Appellant filed his notice of appeal on June 11, 2003, prior to the entry of judgment. At Appellant's behest, judgment was entered on August 19, 2003. Thus, Appellant's notice of appeal relates forward to August 19, 2003, the date judgment was entered. *See* Pa.R.A.P. 905(a) (stating notice of appeal filed after court's determination but before entry of appealable order shall be treated as filed after such entry and on day of entry). Hence, there are no procedural/jurisdictional impediments to our review of this appeal.

¶ 22 The following time line summarizes the parties' significant activities and interactions, upon which this case is based:

1986   ACE issues Appellees a nationwide permit for construction of an impoundment.

DER issues Appellees a permit for construction of a 20.8 acre impoundment of water.

1990  May—ACE informs Appellees that their nationwide permit has expired and they will have to reapply for an individual permit in accordance with the new regulations; Appellees contest the status of their permit as "expired."

June—Appellees submit re-application for permit for a 20.8 acre impoundment at 1505 feet.

November—Initial public [3] notice for the impoundment raises concerns about the possible degradation of surrounding wetlands.

1990–91   ACE asks Appellees to complete their re-application for a permit and to submit alternative plans for a smaller impoundment.

1991   December—ACE informs Appellees their re-application is deemed withdrawn due to their inaction and failure to submit plans for a smaller impoundment.  Appellees continue to contest the expiration of their original permit.

1992   Appellees continue to contest in writing the status of their ACE permit as expired, and proceed as if the permit is valid.

**1993   February—Appellees and Appellant enter into an agreement for the sale of land and the construction of a dam and impoundment of approximately 25 acres.**

April 2, 1993—Parties enter into a reciprocal easement agreement for the water impoundment as contemplated in the parties' February 1993 agreement of sale.

April—Appellant inquires about the status of Appellees' permit and ACE informs him Appellees' re-application has been deemed withdrawn.

May 15, 1993—Appellant informs Appellees in writing that the $25,000.00 held in escrow can be used only for construction of a dam for a 20.8 acre lake.

May—Appellees inform Appellant he must move certain power lines so construction can be completed.

June—Appellant again contacts ACE and is informed that Appellees' project has not been authorized; if construction is occurring, ACE will have to get involved.

June—ACE sends a letter to Appellees reminding them that ACE considers their re-application for a permit withdrawn and their project is not authorized.

June—ACE sends a letter to Appellees requesting the name of their contractor and prohibiting further work on the project.

July—ACE sends a letter to Appellees as a follow-up to the June letter, informing Appellees a meeting would be scheduled to discuss ACE's position on the project.

September—Appellees and their attorney meet with representatives of ACE and the U.S. Attorney's Office, who informs Appellees they are considering an injunction to prevent continuation/completion of the project.

---

**3.**  The "public" notices referenced in this case are not for the public at large.  They are technical and involve various governmental agencies.

September—Following a meeting with ACE representatives and the U.S. Attorney, Appellees agree to halt the project until the permit process is settled/completed and promise to consider other project options to avoid wetlands degradation.

November—ACE posts a public notice for an impoundment of 12.4 acres.

1994 January—ACE offers Appellees two options, neither of which is sufficient to satisfy the original agreement between the parties.

June—ACE issues a permit for construction of a 12.4 acre impoundment at 1500.57 feet.

June—Appellees' attorney sends a letter to Appellant indicating Appellant's failure to. remove certain utility poles prevents completion of the project.

June–November—Appellees' counsel sends additional letters to Appellant stating Appellant's failure to move certain utility poles is the only obstacle to the construction of the impoundment as contemplated by the parties' agreement.

November—Appellees' attorney sends Appellant a letter indicating that if Appellant has utility poles moved, the impoundment would be completed as contemplated.

December—Appellees' attorney warns Appellant of possible legal action against him if Appellant does not move the utility poles as requested.

1995 May—Appellees send a personal letter to Appellant demanding that he move certain utility poles pursuant to the parties' sale agreement.

September 1, 1995—Appellees sue Appellant alleging breach of contract (based on Appellant's failure to move certain utility poles) and fraud (based on Appellant's promise to move the utility poles); claims for punitive damages, damages for "inconvenience and aggravation," and counsel fees.

Appellant files preliminary objections to Appellees' complaint. Preliminary objections are litigated, sustained in part and overruled in part.

1996 Appellant timely files answer to Appellees' complaint, with new matter and counterclaims.

1997 May—Appellant files amended counterclaims for damages, again alleging breach of contract, diminished value of his land as a result of the smaller 12–acre impoundment, fraud, ejectment, monetary losses (including those Appellant incurred as a result of having already moved some of the utility poles), counsel fees and costs.

1997–2001 Discovery, motions, and other pre-trial matters proceed; additional delay caused by Appellees' bankruptcy filing, which is concluded in 1999.

2001 October 12, 2001—The parties take the trial deposition of Dr. Thomas G. Pluto, Ph.D., of ACE, who states that the rerouting of the utility poles is irrelevant to the size of the impoundment.

October 16, 2001—Appellees file a *praecipe* to discontinue their action against Appellant; Appellant's counterclaims proceed.

October 22, 2001—First day of bench trial on Appellant's counterclaims.

2002 February 15, 2002—Second day of bench trial on Appellant's counterclaims.

April 1, 2002—Appellees file post-trial brief.

April 12, 2002, Appellant files reply brief.

July 11, 2002—Trial court files opinion and order dated July 9, 2002, granting

relief on Appellant's ejectment claim and ordering Appellees to remove the fence placed on Appellant's property within 60 days; the court further orders Appellees to pay Appellant the sum of $25,000.00 from the escrow account, plus interest from 5/13/93; with the exception of the ejectment action and the unauthorized use of the escrow money, the court rules all other expenses and damages alleged are the result of a mutual mistake and orders the parties to bear their own expenses and damages, including legal fees.

July 22, 2002—Appellees timely file post-verdict motions requesting relief from the court's order directing them to pay $25,000.00 plus interest to Appellant for the unauthorized use of the escrow funds.

August 1, 2002—Appellant timely files post-verdict motions requesting relief on his claims of breach of contract, fraudulent inducement, fraud, punitive damages, and attorney's fees and costs.

2003    May 12, 2003—Trial court files its opinion and order, dated May 6, 2003, granting Appellees' motion for post-verdict relief and vacating that part of the court's July 2002 order in which the court ordered Appellees to pay Appellant $25,000.00 plus interest; the court further denies Appellant's motion for post-verdict relief.

June 11, 2003—Appellant files his notice of appeal.

June 19, 2003—By order dated June 17, 2003, the trial court orders Appellant to file a Rule 1925(b) concise statement of matters complained of on appeal.

June 27, 2003—Appellant files his Rule 1925(b) statement.

August 19, 2003—judgment is entered.

¶ 23 On appeal, Appellant raises eight issues for our review:

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN FINDING THAT [APPELLEES] HAD NOT BREACHED THE CONTRACTUAL RELATIONSHIP BETWEEN THE PARTIES RELATING TO THE CONSTRUCTION OF AN IMPOUNDMENT OF WATER WHERE THE RECORD CLEARLY DEMONSTRATED THAT (1) THE SIZE OF THE IMPOUNDMENT WAS ESSENTIAL TO THE AGREEMENT, (2) THE PARTIES CONTEMPLATED AND AGREED UPON THE CONSTRUCTION OF A 20.8 ACRE IMPOUNDMENT, (3) THE FINAL IMPOUNDMENT WAS NEARLY 50% OF THE SIZE CONTEMPLATED, (4) [APPELLANT] INFORMED [APPELLEES] THAT HE WOULD NOT AUTHORIZE THE USE OF ANY OF HIS FUNDS FOR AN IMPOUNDMENT SMALLER THAN 20 ACRES, AND (5) [APPELLEES] DISREGARDED THE DIRECTIONS OF [APPELLANT] AND BUILT A SMALLER IMPOUNDMENT [THAN] THAT AGREED UPON BY THE PARTIES?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN FINDING A MUTUAL MISTAKE BETWEEN THE PARTIES AS TO THE SIZE OF THE IMPOUNDMENT WHERE (1) PRIOR TO THE AGREEMENT, [APPELLEES] UNDERSTOOD THAT THEY COULD NOT CONSTRUCT A 20.8 ACRE IMPOUNDMENT, (2) [APPELLEES] ENTERED INTO AN AGREEMENT WITH [APPELLANT] FOR A 20.8 ACRE IMPOUNDMENT WITHOUT NOTIFYING [APPELLANT] THAT

SUCH AN IMPOUNDMENT COULD NOT BE CREATED, AND (3) THERE IS NO EVIDENCE THAT [APPELLANT] UNDERSTOOD THAT A 20.8 ACRE IMPOUNDMENT WOULD NOT BE CREATED?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION WHEN IT CONCLUDED THAT [APPELLEES] WERE ENTITLED TO $25,000 OF ESCROW FUNDS FROM [APPELLANT] WHERE (1) [APPELLEES] MISLED [APPELLANT] AS TO THE SIZE OF THE IMPOUNDMENT, (2) THE PARTIES HAD AGREED UPON A 20.8 ACRE IMPOUNDMENT, (3) [APPELLANT] NOTIFIED [APPELLEES] THAT HIS MONIES WERE NOT TO BE USED TO CONSTRUCT AN IMPOUNDMENT SMALLER THAN 20.8 ACRES, (4) [APPELLEES] IGNORED THE SPECIFIC INSTRUCTIONS OF [APPELLANT] AND IGNORED THE AGREEMENT BETWEEN THE PARTIES BY CONSTRUCTING AN IMPOUNDMENT SUBSTANTIALLY SMALLER THAN 20.8 ACRES, AND (5) [APPELLEES] CONTINUED TO MISLEAD AND MISREPRESENT TO [APPELLANT] THAT THE SIZE OF THE IMPOUNDMENT RESULTED FROM [APPELLANT'S] FAILURE TO MOVE CERTAIN UTILITY POLES, DESPITE [APPELLEES] UNDERSTANDING THAT THE MOVEMENT OF THE UTILITY POLES WOULD NOT RESULT IN A LARGER IMPOUNDMENT OF WATER?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN FINDING THAT A SUBSTANTIALLY SMALLER IMPOUNDMENT OF WATER SATISFIED THE PARTIES' WRITTEN AGREEMENT TO CONSTRUCT A 20.8 ACRE IMPOUND-MENT WHERE THERE WAS NO WRITTEN MODIFICATION OF THE PARTIES' AGREEMENT TO ALLOW FOR THE CONSTRUCTION OF A SMALLER IMPOUNDMENT?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION BY NOT FINDING, BY IMPLICATION, THAT [APPELLEES] HAD ENGAGED IN FRAUDULENT CONDUCT TO INDUCE [APPELLANT] TO ENTER INTO THE CONTRACT TO CONSTRUCT A 20.8 ACRE IMPOUND-MENT WHERE (1) PRIOR TO THE AGREEMENT, [APPELLEES] UNDERSTOOD THAT THEY COULD NOT CONSTRUCT A 20.8 ACRE IMPOUNDMENT, (2) [APPELLEES] ENTERED INTO AN AGREEMENT WITH [APPELLANT] FOR A 20.8 ACRE IMPOUNDMENT WITHOUT NOTIFYING [APPELLANT] THAT SUCH AN IMPOUNDMENT COULD NOT BE CREATED, (3) [APPELLEES] UNDERSTOOD THAT THE SIZE OF THE IMPOUNDMENT WAS ESSENTIAL TO THE AGREEMENT, AND (4) [APPELLEES] KNOWINGLY AND INTENTIONALLY MADE MISREPRESENTATIONS TO [APPELLANT] THAT A 20.8 ACRE IMPOUNDMENT WAS ASSURED IN ORDER TO INDUCE [APPELLANT] TO ENTER INTO THE CONTRACTUAL AGREEMENT?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN CONCLUDING THAT [APPELLANT] HAD FAILED TO PROVE HIS FRAUD CLAIM WHERE THE EVIDENCE CLEARLY DEMONSTRATED THAT (1) [APPELLEES] HAD A SIGNIFICANT PRIOR HISTORY WITH [ACE] AND UNDERSTOOD PRIOR TO THE AGREEMENT THAT [APPELLEES] WOULD NOT BE

PERMITTED TO CONSTRUCT A 20.8 ACRE IMPOUNDMENT, (2) THE SIZE OF THE IMPOUNDMENT WAS ESSENTIAL TO THE AGREEMENT, (3) [APPELLEES] MISREPRESENTED INFORMATION TO [APPELLANT] IN ORDER TO INDUCE HIM INTO ENTERING THE AGREEMENT, NAMELY THAT A 20.8 ACRE IMPOUNDMENT WOULD BE REALIZED, (4) [APPELLEES] NEVER INFORMED [APPELLANT] THAT A 20.8 ACRE IMPOUNDMENT WOULD NOT BE PERMITTED, AND (5) [APPELLANT] RELIED UPON [APPELLEES'] REPRESENTATIONS IN ENTERING INTO THE AGREEMENT FOR CONSTRUCTION OF A 20.8 ACRE IMPOUNDMENT?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN FAILING TO ASSESS PUNITIVE DAMAGES AGAINST [APPELLEES] WHERE (1) [APPELLEES] FRAUDULENTLY INDUCED [APPELLANT] TO ENTER INTO AN AGREEMENT FOR THE CONSTRUCTION OF A 20.8 ACRE IMPOUNDMENT, (2) [APPELLEES] UNDERSTOOD THAT THEY WOULD NOT BE PERMITTED TO CONSTRUCT A 20.8 ACRE IMPOUNDMENT, (3) [APPELLEES] NEVER DISCLOSED THESE FACTS TO [APPELLANT], AND (4) [APPELLEES] INITIATED FRIVOLOUS LITIGATION AGAINST [APPELLANT] SUGGESTING THAT THE SMALLER IMPOUNDMENT RESULTED FROM [APPELLANT'S] FAILURE TO MOVE UTILITY POLES, AS OPPOSED TO [APPELLEES] UNDERSTANDING PRIOR TO THE AGREEMENT THAT A 20.8 ACRE IMPOUNDMENT WOULD NOT BE ALLOWED?

WHETHER THE [TRIAL] COURT ABUSED ITS DISCRETION IN FAILING TO ORDER [APPELLEES] TO PAY [APPELLANT'S] COUNSEL FEES WHERE (1) [APPELLEES] FALSELY ASSERTED IN THEIR PLEADINGS THAT THE SIZE OF THE IMPOUNDMENT RESULTED FROM [APPELLANT'S] FAILURE TO MOVE CERTAIN UTILITY POLES, (2) [APPELLEES'] COUNSEL IN THE LITIGATION AGAINST [APPELLANT] WAS INVOLVED IN THE NEGOTIATIONS OVER THE SIZE OF THE IMPOUNDMENT AND UNDERSTOOD THAT THE SIZE OF THE IMPOUNDMENT WAS NOT RELATED TO THE MOVEMENT OF UTILITY POLES, (3) [APPELLEES] AND THEIR COUNSEL ATTEMPTED TO DECEIVE THE COURT AS TO THE BASIS FOR THE SMALLER IMPOUNDMENT AND ATTEMPTED TO FINANCIALLY BENEFIT FROM THAT DECEPTION, AND (4) PRIOR TO THE LITIGATION [APPELLEES] AND THEIR COUNSEL KNEW THAT [ACE] WOULD NOT ALLOW ANY INCREASE IN THE SIZE OF THE IMPOUNDMENT?

(Appellant's Brief at 5–7).

¶ 24 The relevant standard of review of a court's decision in a non-jury trial is as follows:

[We are] limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper

inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Croyle v. Dellape*, 832 A.2d 466, 470 (Pa.Super.2003) (citing *Behar v. Frazier*, 724 A.2d 943, 946 (Pa.Super.1999)). The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, "unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Fudula v. Keystone Wire & Iron Works, Inc.*, 283 Pa.Super. 502, 424 A.2d 921, 927 (1981).

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa.Super.2000) (internal citations omitted). "To the extent that the trial court's findings are predicated on errors of law, we review the court's findings *de novo.*" *John B. Conomos, Inc. v. Sun Co., Inc. (R & M)*, 831 A.2d 696, 704 (Pa.Super.2003), *appeal denied*, 577 Pa. 697, 845 A.2d 818 (2004).

¶ 25 In his first four issues, Appellant claims the parties entered into a contract for the construction of a 20.8 acre impoundment of water; the size of the impoundment was an essential term of the contract; Appellant conveyed 55 acres of real property to Appellees in exchange for $125,000.00; Appellant contributed $25,000.00 of the purchase price to the construction costs of the dam; and, Appellees agreed to construct a 20.8 acre impoundment at 1505 feet. Appellant avers Appellees breached the parties' contract when they unilaterally decided to reduce the size of the lake significantly, without telling Appellant about the change in plans. Appellant insists he should have been informed of the substantial change in plans to determine whether he wanted to proceed with the reduced impoundment. Appellant maintains Appellees failed to tell him that they could not obtain the permit from ACE for a 20.8 acre impoundment. Instead, Appellees used $25,000.00 of Appellant's funds, without his authorization or waiver, to construct a dam without a permit and an impoundment that was considerably smaller than agreed, to Appellees' primary benefit and to Appellant's measurable detriment. As a result of the breach, Appellant claims he incurred the following damages:

| | |
|---|---|
| Wetland Studies/Contour Maps | $ 15,000.00 |
| Cost of Dam | $ 25,000.00 |
| Lost Property Value of five (5) Lakefront lots | $175,000.00 |
| Total | $215,000.00 |

(Appellant's Brief at 30–31). Appellant also claims he incurred legal expenses in defending against Appellees' lawsuit as well as maintaining his counterclaims against Appellees. Appellant concludes the proper remedy in this case is to affirm the contract and remand for a determination on his breach of contract damages.

¶ 26 Appellant further submits the record does not support the trial court's decision to avoid the contract on the ground of mutual mistake of fact. Appellant insists Appellees knew, when they entered into their agreement with Appellant, that their permit to construct a 20.8 acre impoundment was no longer valid, but they failed to inform Appellant regarding the true status of their permit. Appellees knew their permit had expired. They also knew they could not construct a 20.8 acre impoundment under existing circumstances. Appellees had this information but Appellant did not. Therefore, Appellant reasons, Appellees cannot claim mutual mis-

take of fact as a defense to the formation of the contract. Moreover, to the extent the court concluded the parties were mutually mistaken such that the contract was canceled, Appellant submits the court erred in failing to return the parties to their original position, as if there had been no contract. As such, Appellant claims he should get his land back as well as the $25,000.00 escrow fund used for the construction of the dam, and he should return the purchase price of the land to Appellees. Appellant concludes the court erred in avoiding the contract based upon mutual mistake; in the alternative, the court failed to provide the appropriate remedy under that circumstance.

¶ 27 Additionally, Appellant asserts Appellees wrongfully used the $25,000.00 in escrow to construct a dam without a permit to create a smaller impoundment, over his strict instructions to the contrary. Appellant concludes the court abused its discretion when it (1) ignored record evidence that Appellant had unequivocally conveyed his position on the project to Appellees and (2) failed to award $25,000.00 plus interest to Appellant.

¶ 28 Appellant further argues the parties' agreement contained an integration clause that stated the agreement could not be altered except in writing and by mutual consent of the parties. The contemplated impoundment of 20.8 acres was not created, and the parties did not enter into any written agreement to modify the terms of the original contract to accommodate a smaller impoundment. As a result of their unilateral modification, Appellees created a substantially smaller lake that primarily benefited them to Appellant's detriment. Appellees' conduct constituted a material breach of the parties' contract. Appellant submits the trial court abused its discretion when it found the smaller impoundment satisfied the parties' original agree-

ment. For all of the foregoing reasons, Appellant concludes the court erred and abused its discretion when it denied him any relief on his breach of contract claim, and its decision must be reversed and the matter remanded for a determination of damages. We agree.

■■■■ ¶ 29 To successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Gorski v. Smith*, 812 A.2d 683 (Pa.Super.2002), *appeal denied*, 579 Pa. 692, 856 A.2d 834 (2004) (citing *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.1999)).

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Murphy v. Duquesne University Of The Holy Ghost*, 565 Pa. 571, 591, 777 A.2d 418, 429 (2001) (internal citations and quotation marks omitted). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa.Super.1999). Further, "specific, express written language is not necessary for a particular contractual intent to exist in an agreement. Rather, it is common for

the intent of contracting parties to be inherent in the totality of their contract." *Murphy, supra* at 596, 777 A.2d at 432. "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Slater v. Pearle Vision Center, Inc.*, 376 Pa.Super. 580, 546 A.2d 676, 679 (1988) (describing what is known as "doctrine of necessary implication"). "The meaning of an unambiguous written instrument presents a question of law for resolution by the court." *Murphy, supra* at 591, 777 A.2d at 430.

■■■■■ ¶ 30 Pennsylvania courts regularly employ the Restatement (Second) of Contracts when resolving contract disputes. *See Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943 (Pa.Super.2004).[4] The doctrine of mutual mistake of fact serves as a defense to the formation of a contract and occurs when the parties to the contract have "an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party." *Bianchi v. Bianchi*, 859 A.2d 511, 516 n. 3 (Pa.Super.2004). "A mutual mistake occurs when the written instrument fails to . . . set forth the 'true' agreement" of the parties. *Daddona v. Thorpe*, 749 A.2d 475, 487 (Pa.Super.2000), *appeal denied*, 563 Pa. 702, 761 A.2d 550 (2000). "[T]he language of the instrument should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed." *Id.* (internal quotation marks and citation omitted)

¶ 31 The Restatement (Second) of Contracts § 152 provides:

§ 152. When Mistake Of Both Parties Makes A Contract Voidable

**(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.**

**(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.**

Restatement (Second) of Contracts § 152 (1981). Under this section,

[T]he contract is voidable by the adversely affected party if three conditions are met. First, the mistake must relate to a "basic assumption on which the contract was made." Second, the party seeking avoidance must show that the mistake has a material effect on the agreed exchange of performances. Third, the **mistake must not be one as to which the party seeking relief bears the risk.** The parol evidence rule does not preclude the use of prior or contemporaneous agreements or negotiations to establish that the parties were mistaken. However, since mistakes are the exception rather than the rule, the trier of the facts should examine the evidence with particular care when a party attempts to avoid liability by proving mistake. The

---

4. In its decision to deny Appellant relief on his breach of contract claim, the trial court employed a combination of two legal doctrines, mutual mistake of fact and "frustration of purpose" or "impracticability of performance." *See* Trial Court Opinion, filed July 11, 2002, at 9.

rule stated in this Section is subject to that in § 157 on fault of the party seeking relief. It is also subject to the rules on exercise of the power of avoidance stated in §§ 378–85.

*Id.* Comment: *a. Rationale* (emphasis added). *See also Loyal Christian Ben. Ass'n v. Bender,* 342 Pa.Super. 614, 493 A.2d 760, 762 (1985) (stating "If this tripartite test is met, the injured party may acquire reformation of the contract or . . . avoid the contractual obligations").

■■■■ ¶ 32 A contract entered into under a mutual misconception as to an essential element of fact may be rescinded or reformed upon the discovery of the mistake if (1) the misconception entered into the contemplation of both parties as a condition of assent, and (2) the parties can be placed in their former position regarding the subject matter of the contract. *Gocek v. Gocek,* 417 Pa.Super. 406, 612 A.2d 1004, 1006 (1992). In other words, mutual mistake occurs when a fact in existence at the time of the **formation** of the contract, but unknown to both parties, will materially affect the parties' performance of the contract. *Loyal Christian Ben. Ass'n, supra.*

■■■■ ¶ 33 Section 154 of the Restatement (Second) of Contracts provides:

§ 154. When A Party Bears The Risk Of A Mistake

**A party bears the risk of a mistake when**

**(a) the risk is allocated to him by agreement of the parties, or**

**(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or**

**(c) the risk is allocated to him by the court on the ground that it is**

**reasonable in the circumstances to do so.**

Restatement (Second) of Contracts § 154 (1981). "The rule stated in this Section determines whether a party bears the risk of a mistake for purposes of [Sections] 152 and 153." *Id.* Comment: *a. Rationale.* "Even though a mistaken party does not bear the risk of a mistake, he may be barred from avoidance if the mistake was the result of his failure to act in good faith and in accordance with reasonable standards of fair dealing." *Id.*

A contract [made under] a mutual mistake as to an essential fact which formed the inducement to it, may be rescinded on discovery of the mistake, if the parties [can be] placed in their former position with reference to the subject-matter of it.

*Ehrenzeller v. Chubb,* 171 Pa.Super. 460, 90 A.2d 286, 287 (1952).

¶ 34 Additionally, Pennsylvania law recognizes the doctrine of frustration of contractual purpose or "impracticability of performance" as a valid defense to performance under a contract. *Alvino v. Carraccio,* 400 Pa. 477, 482, 162 A.2d 358, 361 (1960); *Ellwood City Forge Corp. v. Fort Worth Heat Treating Co., Inc.,* 431 Pa.Super. 240, 636 A.2d 219, 222 (1994). The Restatement (Second) of Contracts § 261 provides:

§ 261. Discharge By Supervening Impracticability

**Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.**

Restatement (Second) of Contracts § 261 (1981). Additionally, Section 264 of the Restatement (Second) of Contracts states:

§ 264. Prevention By Governmental Regulation Or Order

**If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the nonoccurrence of which was a basic assumption on which the contract was made.**

Restatement (Second) of Contracts § 264 (1981). Our Supreme Court has explained:

When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is *prima facie* regarded as dissolved. ... A court can and ought to examine the contract and the circumstances in which it was made, not of course to vary, but only to explain it, in order to see whether or not, from the nature of it the parties must have made their bargain on the footing that a particular thing or state of things would continue to exist. And if they must have done so, then a term to that effect will be implied, though it be not expressed in the contract.

*Greek Catholic Congregation of Borough of Olyphant v. Plummer*, 338 Pa. 373, 382, 12 A.2d 435, 439 (1940) (internal citations and quotation marks omitted).

■ ¶ 35 Once impracticability of performance or frustration of purpose occurs, "it is up to the parties to waive the difficulties or seek to terminate the agreement." *Ellwood, supra* at 223. If a party proceeds under the original contract, despite the impracticability that would otherwise justify his non-performance, and is then unable to perform as previously agreed, he can be liable for damages. Restatement (Second) of Contracts § 261 (1981). On the other hand, a party who has already performed under a contract, which is dissolved on the ground of supervening impracticability, is generally allowed a claim for restitution to the extent his performance has benefited the other party. Restatement (Second) of Contracts § 272 Comment: *b. Relief including restitution.* "In a proper case recovery may go beyond mere restitution and include elements of reliance by the claimant, even though they have not benefited the other party." *Id.* (referencing Section 377 of Restatement (Second) of Contracts). Under the proper circumstances, "If both parties have rendered some performance, each is entitled to restitution against the other." Restatement (Second) of Contracts § 377.

■ ¶ 36 In the instant case, the parties' February 1993 agreement provided that Appellees would buy and Appellant would sell approximately 55 acres of unimproved land from Appellant's property, which was comprised of 107 acres in Susquehanna County. The "Earl Lorah Plan" attached to the agreement, specifically incorporated by reference and made a part thereof, allots on the drawing approximately 25 acres to an impoundment of water. Consideration for the sale was set forth in the agreement as follows:

3. **TERMS:** The consideration for the 55 acres shall depend, in part, upon the completion of a dam for the impoundment of water:

a. The consideration for the 55 acres shall be $99,000.00 (NINETY–NINE THOUSAND DOLLARS) [$100,000.00 LESS $1,000.00 PAID TO Seller on June 1, 1990] plus construction of a dam upon Buyers' land **for the impound-**

ment of water pursuant to the Earl Lorah Plan, sheet 4 (of five sheets) of said plan is attached hereto as Exhibit "B" and incorporated herein by reference.

b. The consideration for the 55 acres shall be $125,000.00 (ONE–HUNDRED–TWENTY–FIVE–THOUSAND DOLLARS) if Buyers do not complete construction of the said dam within six months of obtaining all approvals required by any government agencies.

c. At settlement, Buyers shall pay Sellers $99,000.00 (NINETY–NINE–THOUSAND DOLLARS).

d. At settlement, Buyers shall place $25,000.00 (TWENTY–FIVE THOUSAND DOLLARS) in escrow, in an interest bearing account, with County National Bank, Montrose, Pennsylvania or an alternate banking institution of Buyers choice.

e. The said $25,000.00, together with all accrued interest, shall be released to Seller if Buyers fail to complete construction of the dam not later than six months from the date of the last required approval by any governmental agency.

f. In the event that any government agency denied any approval required for Buyers to construct the dam, the $25,000.00 shall not be released to Seller until Buyers have exhausted all remedies to defeat denial. Said remedy period not to extend beyond July 31, 1995.

g. The said $25,000.00, together with all accrued interest, shall be released to Buyers upon the completion of the construction of the dam and upon final inspection and approval of John Chernesky, Supervisor for Dams and Waterways for the Department of Environmental Resources.

(Agreement for the Sale of Real Estate, February 1993, at 1–3; R.R. at 11a–13a) (emphasis added). The Agreement further provided:

**8. CONSTRUCTION OF DAM:**

a. The dam is to be constructed on the Buyers' property and **shall be of sufficient size and strength to allow for flaring out the proposed impounded water on Seller's land as contemplated by the parties.**

\* \* \*

**10. ENTIRETY:** This agreement, **along with those documents incorporated by reference,** constitute the entire agreement between the parties and may not be altered except in writing and by mutual consent of the parties.

**11. BINDING AGREEMENT:** It is the intent of the parties to be legally bound by the terms of this agreement. This Agreement **along with those documents incorporated by reference** are to survive settlement.

(*Id.* at 5–7; R.R. at 15a–17a) (emphasis added).

■ ¶ 37 With respect to Appellant's breach of contract claim, the trial court reasoned Appellant did not produce enough evidence to prove Appellees breached the parties' agreement, because "The Agreement does not provide any remedy for [Appellees'] and [Appellant's] mistaken belief that their Agreement, and not [ACE] would be the final authority on the size of the impoundment." *See* Trial Court Opinion at 9. This conclusion is not supported by the evidence of record or Appellees' own admissions in their pleadings.[5] To the contrary, the record makes

---

5. We note Appellees did not at any time plead the affirmative defense of mutual mistake of fact. Appellees raised this defense for the first time in their post-trial brief. However,

clear that the parties' agreement was for an impoundment of approximately 20.8 acres. The agreement was specifically contingent on ACE approval and Appellees' ability to obtain the proper permits for the dam **and** the impoundment, as described in the "Earl Lorah Plan" that was incorporated into the parties' agreement by reference. Appellees also admitted in their original pleading that the parties intended a 20.8 acre impoundment and that Appellees bore the responsibility for obtaining the proper permits to construct that impoundment. The record further demonstrates Appellees knew for several years before the agreement that the permits they had were in dispute. Appellees simply did not follow through in resolving the ACE permit dispute in a manner favorable to the agreement. Despite the court's credibility determination that Appellees did not know definitively about the finality of the permits before they entered into the agreement with Appellant, we conclude Appellees bore the risk that their beliefs were incorrect and cannot use their own mistake to escape their contractual obligations to Appellant. Therefore, the court erred as a matter of law when it excused Appellees on the basis of mutual mistake of fact. *See Loyal Christian Ben. Ass'n, supra.*

■ ¶ 38 The court's conclusion, that ACE would be the final authority on the size of the impoundment, is more in the nature of "frustration of purpose," not "mutual mistake of fact." In September 1993, Appellees' performance was made impracticable by having to comply with a governmental regulation, the non-occurrence of which was a basic assumption on which the contract was made. *See* Restatement (Second) of Contracts § 264 (1981). This occurrence constituted a val-

id defense to performance under the parties' agreement. *See Alvino, supra.* It was then up to Appellees to obtain Appellant's waiver or to seek to terminate the contract, before Appellees moved forward with construction of a smaller lake. *See Ellwood, supra.* Appellees did not even inform Appellant of the changed circumstances. Instead, Appellees unilaterally decided to create a substantially smaller impoundment to their considerable benefit and Appellant's obvious detriment. Therefore, Appellees must bear the consequences of their unilateral decision. Appellees proceeded under the parties' original contract, despite the impracticability that would have otherwise justified their non-performance, and were unable to perform as previously agreed. Thus, Appellees can be liable for damages. *See* Restatement (Second) of Contracts § 261 (1981).

¶ 39 On the other hand, Appellant had already performed under the parties' agreement and should be allowed a claim for restitution to the extent his performance has benefited Appellees. *See* Restatement (Second) of Contracts § 272 Comment: *b. Relief including restitution.* Thus, Appellant is entitled to damages in the form of restitution to the extent his performance prior to Appellees' breach benefited Appellees, and his damages may go beyond mere restitution to include losses stemming from Appellant's reliance on the contract, even if those losses did not directly benefit Appellees (for example, the loss in property value of Appellant's lakefront lots as a result of construction of the smaller lake). *See generally* Restatement (Second) of Contracts § 272 (1981).

¶ 40 Moreover, Appellant's May 15, 1993 letter, informing Appellees they were to

---

Appellant responded to the defense on the merits and failed to argue waiver. As such,

Appellant himself waived any waiver argument on his own behalf.

use his money to build a dam only in connection with the construction of a 20.8 acre impoundment as agreed to by the parties, did not constitute an attempted modification of the parties' original agreement. A careful review of the terms of the parties' agreement demonstrates the dam was to be completed only for 20+ acre impoundment of water. (*See* Agreement for the Sale of Real Estate, February 1993; R.R. at 11a–16a.) The parties' agreement did not authorize Appellees to build a dam large enough to support the intended impoundment, separate and apart from or regardless of the eventual size of the impoundment. The written agreement makes clear that the construction of the dam was integrally related to and authorized for only the size of the intended impoundment. Appellant's May 1993 letter merely reiterated the parties' agreement.[6] Accordingly, we respectfully reverse the court's decision in favor of Appellees on the ground of mutual mistake and remand this matter to the trial court for a full determination of Appellant's damages, because the trial court made no findings as to damages. *See generally Birth Center v. St. Paul Companies, Inc.,* 567 Pa. 386, 787 A.2d 376 (2001) (stating purpose of damages in contract actions is to return parties to position they would have been in but for breach); *Harman v. Chambers,* 358 Pa. 516, 57 A.2d 842 (1948) (stating, "Generally speaking, the measure of damages applicable in a case of breach of contract is that the aggrieved party should be placed as nearly as possible in the same position he would have occupied had there been no breach. In other words, he is entitled to be reimbursed for the money actually paid out and for all reasonable and proper ex-penses incurred on the faith of the contract."); *Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.,* 764 A.2d 1106 (Pa.Super.2000) (stating, "The policy behind contract law is to protect the parties' expectation interests by putting the aggrieved party in as good a position as he would have been had the contract been performed.").

¶ 41 In issues five, six and seven, Appellant maintains Appellees engaged in fraudulent conduct to induce Appellant to enter into the parties' agreement. Specifically, Appellant contends Appellees knew or should have known they could not fulfill their part of the contract but nevertheless intentionally misled him to believe they could. Appellant argues Appellees were privy to certain information, before the agreement was signed, regarding the probability that they could not create a 20.8 acre impoundment and that ACE was requesting plans for a scaled-down project. Appellant claims Appellees did nothing to resolve ACE's reservations before they initiated the agreement with Appellant. Instead, Appellees affirmatively represented to Appellant there would be no problem getting ACE approval for construction of the 20.8 acre lake. Appellant argues Appellees withheld this information for the specific purpose of inducing Appellant to enter into the parties' agreement and sell them 55 acres of prime realty at a reduced price. Appellant asserts he would not have entered into the parties' contract but for Appellees' "fraudulent representations" that they had a valid permit from ACE. Appellant asserts the record irrefutably demonstrates Appellees committed fraud in the **inducement**.

We reject that contention, where the record and agreement as a whole makes clear the parties contemplated an impoundment of at least 20 acres.

---

**6.** Appellees did not file a brief on appeal. In their post-trial brief, however, they argued the parties did not really agree on an exact size of the intended impoundment, which in and of itself constituted a mutual mistake of fact.

¶ 42 Further, Appellant directs our attention to instances of Appellees' alleged "wanton" conduct following the formation of the parties' contract. For example, Appellant complains Appellees proceeded to construct a dam without a valid permit; used his funds to construct a smaller impoundment to benefit their property, including the land acquired from Appellant, without regard to Appellant's rights under the contract or the devaluation of his property; and instituted a frivolous lawsuit against Appellant for breach of contract upon the false premise that they would have completed the project as called for in the parties' agreement, but for Appellant's failure to move certain utility poles. Essentially, Appellant asserts Appellees committed fraud in the **performance** of the contract. Appellant concludes the trial court's decision must be reversed and the matter remanded for a determination of damages on his fraud claims. Appellant also alleges Appellees' conduct was so egregious as to support his claim for punitive damages. Appellant maintains the court erred in dismissing this claim as well. We disagree with Appellant's contentions.

¶ 43 Appellant's fraudulent inducement and fraudulent performance claims implicate the following principles.[7]

In general, courts are cautious about permitting tort recovery based on contractual breaches. In keeping with this principle, this Court has recognized the "gist of the action" doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims. The conceptual distinction between a breach of contract claim and a tort claim has been explained as follows:

> Although they derive from a common origin, distinct differences between civil actions for tort and contractual breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

However, a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral. The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus. In other words, **a claim should be limited to a contract claim when the parties'**

---

7. "Fraud is a generic term used to describe anything calculated to deceive, whether by a single act or combination, or by suppression of the truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa.Super.2003), *appeal denied*, 573 Pa. 714, 828 A.2d 349 (2003).

To prove fraud, a plaintiff must demonstrate by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud. *Id.* (internal citations omitted).

**obligations are defined by the terms of the contracts,** and not by the larger social policies embodied by the law of torts.

*Pittsburgh Const. Co. v. Griffith,* 834 A.2d 572, 581–82 (Pa.Super.2003), *appeal denied,* 578 Pa. 701, 852 A.2d 313 (2004) (quoting *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 14 (Pa.Super.2002)) (internal citations omitted) (emphasis added).

"Gist" is a term of art in common law pleading that refers to "the essential ground" or object of the action in point of law, without which there would be no cause of action. The "gist of the action" test...is a general test concerned with the "essential ground," foundation, or material part of an entire "formal complaint" or lawsuit.

*Id.* at 15 (internal citations omitted).

[P]ersuasive authority interpreting Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These courts have held that the doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*Id.* at 19 (internal quotation marks omitted). Where fraud claims are intertwined with breach of contract claims and the duties allegedly breached are created and grounded in the contract itself, the gist of the action is breach of contract. *Id.* at 18. Thus, claims of fraud in the **performance** of a contract are generally barred under the gist of the action doctrine. *Id.* at 17.

¶ 44 Likewise, fraud-in-the-inducement claims are commonly barred if the contract at issue is fully integrated.[8] *Blumenstock, supra.* The rationale for this rule of law is "that a party cannot justifiably rely upon prior oral representations" and then sign a contract containing terms that refute the alleged prior oral representations. *Id.* at 1036. Thus, when "prior fraudulent oral misrepresentations are alleged regarding a subject that was specifically dealt with in a written contract, the party alleging such representations must, under the parol evidence rule, also aver that the representations were fraudulently or by accident or mistake omitted from the integrated written contract." *HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 398, 652 A.2d 1278, 1279 (1995). "To require less would make a mockery of the parol evidence rule because all a party would have to do to avoid, modify or nullify [a contract] would be to aver that false representations were 'fraudulently' made." *Nicolella v. Palmer,* 432 Pa. 502, 507, 248 A.2d 20, 23 (1968).

¶ 45 In other words, parol evidence of prior representations is inadmissible as to a matter covered by the written agreement with an integration clause, unless the parties agreed that those representations would be added to the written agreement but they were omitted because of fraud, accident or mistake. This situation is commonly referred to as "fraud in the execution" [as] the party proffering the evidence contends that he executed the agreement because he was defrauded by be-

---

8. An exception to this rule has been carved out for "real estate inspection cases," which involve written agreements for the sale of real property, almost always residential, even though they contain integration clauses. *Blumenstock, supra.* The exception does not apply to the present case.

ing led to believe that the documents contained terms that were actually omitted therefrom.

*Blumenstock, supra* at 1036 (internal citations omitted). "The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract." *1726 Cherry Street Partnership by 1726 Cherry Street Corp. v. Bell Atlantic Properties, Inc.*, 439 Pa.Super. 141, 653 A.2d 663, 665 (1995), *appeal denied*, 544 Pa. 647, 664 A.2d 976 (1995).

■ ¶ 46 In the instant case, Appellant's claims of fraud in the **performance** of the contract are integrally related to his breach of contract claims. The performance duties arose solely from the contract between the parties and were created and grounded in the contract itself. Further, these claims essentially duplicate Appellant's breach of contract claim and the success of his fraud-in-the-performance claims is wholly dependent on the terms of a contract. *See Pittsburgh Const. Co., supra; eToll, Inc., supra.* Thus, Appellant's fraud in the performance claims are barred under the gist of the action doctrine, because they are collateral to the contract, which is the main cause of action. *See id.*

■ ¶ 47 With respect to Appellant's fraud-in-the-inducement claim, we note the parties' contract contains an integration clause. (*See* Agreement for the Sale of Real Estate ¶ 10. **ENTIRETY**; R.R. at 17a.) The agreement was fundamentally contingent on governmental agency approval. Thus, Appellant cannot claim he justifiably relied upon the alleged prior oral representations, where he signed a contract containing terms that arguably conflict with these alleged prior representations. *See H.C.B. Contractors, supra.* Moreover, Appellant failed to aver that the alleged prior oral representations were fraudulently omitted from the integrated written contract. If Appellees affirmatively represented to Appellant that there would be no problem getting ACE approval for construction of the 20.8 acre lake, and that representation was a material inducement to obtain Appellant's assent to the project, that assertion should have been included in the agreement. *See LeDonne v. Kessler*, 256 Pa.Super. 280, 389 A.2d 1123 (1978) (citing *Bardwell v. Willis Co.*, 375 Pa. 503, 100 A.2d 102 (1953)) (stating where party asserts he relied on understandings, promises or representations made prior to execution of written contract, party should have protected himself by incorporating into written agreement those understandings, promises or representations upon which he now relies). Therefore, under the parol evidence rule, Appellant's fraud-in-the-inducement claims are barred as well. *See HCB Contractors, supra; Blumenstock, supra; 1726 Cherry Street Partnership, supra.*

¶ 48 Consistent with the cited principles of law, there is no reason to disturb the trial court's rejection of Appellant's fraud claims. *See Pittsburgh Const. Co., supra; eToll, Inc., supra. See also HCB Contractors, supra; Blumenstock, supra.* Due to our disposition of the appeal, we likewise affirm the trial court's denial of Appellant's prayer for punitive damages. *See Baker v. Pennsylvania National Mutual Casualty Insurance Company*, 370 Pa.Super. 461, 536 A.2d 1357 (1988), *aff'd*, 522 Pa. 80, 559 A.2d 914 (1989) (stating punitive damages are not recoverable merely for breach of contract).

¶ 49 In his final issue, Appellant argues Appellees' original lawsuit against him was arbitrary, vexatious, and in bad faith. Appellant claims Appellees' action falsely contended that the reduction in size of the impoundment was Appellant's fault, in an effort to cast the responsibility of the failed project on Appellant. Appellant points to several factors in support of his position: (1) Appellant specified he did not want an impoundment less than 20.8 acres; (2) Appellees unilaterally applied for a permit to create an impoundment of 12.4 acres that did not implicate the utility poles; (3) ACE did not require the utility poles to be moved; (4) ACE did not indicate that it would authorize a larger impoundment if the utility poles were removed; and (5) ACE did not raise the utility poles as a potential problem with the impoundment. Appellant maintains Appellees' lawsuit was wholly predicated upon false assertions that he, not Appellees, were at fault. Appellant concludes he is entitled his attorney's fees related to the defense of Appellees' lawsuit. We agree with Appellant, but only to the extent that this claim should be considered on remand.

■ ¶ 50 Generally, litigants are responsible for their own counsel fees unless otherwise permitted by statutory authority, agreement of the parties, or some other recognized exception to the general rule. *Chatham Communications, Inc. v. General Press Corp.*, 463 Pa. 292, 344 A.2d 837 (1975). A trial court may award counsel fees to a party when that party's opponent acts in a dilatory, obdurate or vexatious manner during the pendency of the case. 42 Pa.C.S.A. § 2503. The statute provides:

> § 2503. **Right of participants to receive counsel fees**
>
> The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:

\* \* \*

> (9) Any participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith.

42 Pa.C.S.A. § 2503(9).

The statutory provision at 42 Pa.C.S. § 2503(9) expressly permits a trial court to award reasonable counsel fees to a litigant when, *inter alia*, that litigant's opponent initiated the action arbitrarily, vexatiously *or* in bad faith. An opponent's conduct has been deemed to be "arbitrary" within the meaning of the statute if such conduct is based on random or convenient selection or choice rather than on reason or nature. An opponent also can be deemed to have brought suit "vexatiously" if he filed the suit without sufficient grounds in either law or in fact and if the suit served the sole purpose of causing annoyance. Finally, an opponent can be charged with filing a lawsuit in "bad faith" if he filed the suit for purposes of fraud, dishonesty, or corruption.

By imposing these strict definitional guidelines, the statute serves not to punish all those who initiate legal actions which are not ultimately successful or which may seek to develop novel theories in the law. Such a rule would have an unnecessarily chilling effect on the right to bring suit for real legal harms suffered. Rather, the statute focuses attention on the conduct of the party from whom attorney's fees are sought and on the relative merits of that party's claims.

*Thunberg v. Strause*, 545 Pa. 607, 615–16, 682 A.2d 295, 299 (1996) (internal citations omitted). The amount of counsel fees allowed is within the discretion of the trial court, whose opportunities are necessarily

greater for judging the exact amount of labor, skill and responsibility involved as well as the prevailing rate of professional compensation. *In re LaRocca's Trust Estate*, 431 Pa. 542, 246 A.2d 337 (1968).

¶ 51 In the present case, Appellant presented evidence that before Appellees filed suit, the impoundment of water had reached the maximum size of 12.4 acres allowed by ACE and the unmoved utility lines, which were the basis for Appellees' suit, were not implicated. The only way the utility lines would be inundated with water was if Appellees attempted to utilize stop logs in the dam, ultimately prohibited by ACE, to create a water impoundment greater than 12.4 acres. Nevertheless, Appellees' attorney sent several letters to Appellant threatening legal action if the utility poles were not moved, and indicating that the power lines would otherwise be inundated by water. Appellees' attorney attested he had personally inspected the site. Such inspection, however, could have revealed only that the 12.4 acre impoundment did not implicate the subject utility lines. These actions on the part of Appellees and their counsel indicate Appellees' suit against Appellant may well have been filed and pursued vexatiously in an effort to divert attention from the real reason for the creation of the smaller impoundment. *See Thunberg, supra.* Therefore, we also remand this issue to the trial court for consideration of an award of counsel fees and costs, limited to Appellant's defense against Appellees' lawsuit but not to include fees and costs associated with the prosecution of Appellant's counterclaims. *See Township of South Strabane v. Piecknick*, 546 Pa. 551, 686 A.2d 1297 (1996) (stating appellate court has no power under any statute or rule of court to award counsel fees for proceedings in trial court).

¶ 52 Based upon the foregoing, we hold that the court erred when it excused Appellees from contractual liability on the ground of mutual mistake of fact. We further hold that the court properly dismissed Appellant's fraudulent inducement/fraudulent performance and punitive damages claims. Finally, we remand the matter for further proceedings regarding damages on Appellant's breach of contract claim and his claim for counsel fees related to Appellant's defense against Appellees' original lawsuit. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this disposition.[9]

¶ 53 Judgment affirmed in part; reversed in part; case remanded for further proceedings. Jurisdiction is relinquished.

---

9. The trial court also ejected Appellees from Appellant's real property in excess of the metes and bounds in the map attached to the parties' agreement and ordered them to remove any fence or other like material from Appellant's land. Appellees did not appeal this decision. Accordingly, it remains undisturbed.