## Carruthers v. Messner Enterprises Northgate

C.P. of Lancaster County, No. CI-09-07812

*Timothy J. Woolford,* for plaintiffs.
*Robert W. Hallinger,* for defendants.

FARINA, *J.,* November 19, 2013—Presently before the court are the post-trial motions of plaintiffs Ralph and Carol Carruthers ("plaintiffs") and defendants Messner Enterprises Northgate, LLC ("Northgate"), Steven R. Messner ("Messner"), S.C.C.S., Inc. ("SCCS"), and JR Transportation Group, Inc. ("Group"). Some of the instant motions were prematurely filed, as the parties filed them after the jury verdict but before the court issued its final adjudication and molded the verdict. However, all post-trial motions, including those that were prematurely filed, are now ready for disposition.

This action involved claims for breach of contract against Messner and Northgate,[1] claims under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") against Messner and Northgate, conversion against Messner and Northgate, unjust enrichment against Messner, Northgate, SCCS, and Group, constructive

---

1. The claim against Messner outlined liability for the debts of Northgate on a theory of piercing the corporate veil.

trust against SCCS and JR, piercing the corporate veil against SCCS and Group, and accounting against SCCS and Group. This action also involved a counterclaim by Northgate against Plaintiffs.

During the week of June 24, 2013, a jury trial was held on the breach of contract claims, the UTPCPL claims, the conversion claims, and the counterclaim. At trial, the defendants' motion to dismiss plaintiffs' conversion claims under the "gist of the action" doctrine was granted, and plaintiffs' motion to dismiss the UTPCPL claims under the "economic loss" and "gist of the action" doctrines was denied. The jury found Northgate liable for breach of contract, awarding $525,431.19, and a violation of the UTPCPL, awarding $100, and found Messner liable for a violation of the UTPCPL, awarding $100.

On July 1, 2013, plaintiffs filed a post-verdict motion asking the court to determine damages on the UTPCPL claims, or in the alternative, to mold the award on the UTPCPL claims to equal the amount awarded on the breach of contract claim, or in the alternative, for a new trial on damages.[2] On July 8, 2013, plaintiffs filed additional post-verdict motions, incorporating their requests from the July 1, 2013 motion, and asking the court to release the $42,500 held in escrow,[3] for prejudgment and post-judgment interest on the awards, for judgment against Messner on count VI, unjust enrichment, and for judgment against Northgate and Messner on counts III and IV, conversion, which were dismissed at trial. That same day, defendants filed post-verdict motions requesting a new trial on the breach of contract claim against Northgate,

_____

2. The motion also included a preliminary request for attorney's fees and costs.

3. These funds were subsequently released.

claiming that certain evidence of loan difficulties after 2008 should not have been admitted, and asking the court to set aside the jury verdict on the UTPCPL claims and dismiss those claims on the basis of the "gist of the action" and "economic loss" doctrines, a motion that was raised and denied, prior to, and at, trial.

On September 13, 2013, after non-jury trial on the equitable claims, the court filed its adjudication molding the verdict and disposing of the remaining claims. The court found in favor of plaintiffs and against defendant Steven R. Messner on count II, breach of contract, on a theory of piercing the corporate veil, and against plaintiffs on the remaining claims. The adjudication also denied all relief requested by plaintiffs on the issue of damages on the UTPCPL claims.[4]

On October 7, 2013, the court conducted a pre-hearing conference with counsel on the issue of plaintiffs' request for an award of attorney's fees and pre and post-judgment interest. The parties were given a pre-hearing briefing schedule, filed their respective briefs, and an evidentiary hearing was held on October 30, 2013.

This opinion will address all post-trial motions filed to date, including those that were filed prematurely.

## I. Defendants' Post-Verdict Motions:

### 1. Defendants' Motion for New Trial on the Breach of Contract Claim Against Northgate

Defendants claim that certain evidence of Northgate's financial difficulties from May of 2009 and of subsequent defaults by Northgate and Messner on the UNCB loans was irrelevant to the breach of contract claims and the

---

4. However, the court did not decide the issue of attorney's fees.

UTPCPL claims. As a result, they request a new trial on the breach of contract claims against Northgate.

Defendants claim that the evidence of loan defaults that occurred in January and February of 2010, specifically complaints in confession of judgment against all of the defendants in this case, was "irrelevant to the actual conduct at issue in 2008" because the loan defaults "occurred long after the time period encompassing the alleged breach of contract and deceptive conduct, which all occurred in 2008." Defendants argue that this evidence "likely tainted the jurors' view of defendants in a negative fashion on the basis of irrelevant evidence." They make the same arguments with respect to the evidence of loan defaults by Messner, which occurred in December 2009 through May 2010, specifically the testimony of Philip Balas of UNCB and exhibits P-121 and P-122, which were notices of intention to foreclose against Messner filed by UNCB. They also make these arguments about the evidence of Northgate's loan difficulties, documented on May 1, 2009, specifically the testimony of Patrick Cowan and exhibit P-42.

Contrary to defendants' assertions, all of this evidence was highly relevant to the conduct at issue in 2008. To be sure, the financial troubles of Northgate and Messner came to a head after the deceptive assurances were made and after the contract was breached. However, that does not render the evidence irrelevant.

The challenged evidence was relevant to the UTPCPL claims because plaintiffs alleged that Messner obtained the additional monies from plaintiffs because his companies were drowning and on the verge of collapse. The evidence about subsequent loan defaults by defendants is circumstantial evidence of why Messner requested, and

Northgate obtained, the additional monies from plaintiffs, *i.e.*, it shows that the true reason the money was needed was to prevent his companies from going under, not to speed up construction. The challenged evidence shows not only what his fears were that prompted the deceptive conduct, but also that those fears were legitimate ones.[5] Thus, the evidence was clearly relevant to show the element of deception needed to sustain a claim under the UTPCPL. *See* 73 P.S. §201-2(4)(xxi) (requiring proof of "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.").

The challenged evidence was also arguably relevant to lay the foundation for the breach of contract claims. The evidence shows that Messner had legitimate fears about a default on the UNCB loans and that such fears motivated him to sacrifice his contractual obligations to plaintiffs in order to save SCCS.

Even if the evidence was irrelevant to the breach of contract claims, the evidence would have still come in on the unfair trade claims. *See Commonwealth v. Johnson*, 327 A.2d 632, 635 (Pa. 1974) ("Evidence admissible for one purpose but not for another may be admitted..."). While defendants would have been entitled to a limiting instruction informing the jury of the purpose for which the evidence could be considered,[6] "[they] failed to request a limiting jury instruction, and, therefore, [they] will not now be heard to complain regarding the jury's consideration of the evidence." *Commonwealth v. Whitaker*, 878 A.2d 914, 923 (Pa. Super. 2005).

---

5. Defendants mischaracterize these loan difficulties as bad acts occurring in 2009. While the various documents were created in 2009, the circumstances that led to the defaults developed long before that.

6. *Id.*

2. Defendants' Motion to Set Aside the Jury Verdict on the UTPCPL Claims

Defendants argue that plaintiffs' UTPCPL claims are barred by the "economic loss" doctrine and the "gist of the action" doctrine. They claim the court committed an error of law by permitting the UTPCPL claims to go to a jury. I disagree.

The "gist of the action" doctrine, discussed in part (ii), *supra*, essentially stands for the notion that "a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002) (quotation omitted). Defendants cite *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. 2005) for the proposition that plaintiffs' UTPCPL claims are barred by the doctrine. However, *Hart* involved common-law fraud claims, not statutory claims under the UTPCPL, and for the reasons discussed below, I do not believe the "gist of the action" doctrine should be extended to cover such claims.

Although it has been expanded to other areas, the "economic loss" doctrine originated as a bar to products liability claims based solely on economic losses. The justification for the doctrine was that purchasers of products could seek recompense for purely economic harm through a breach of warranty claim. Defendants cite *Werwinski v. Ford Motor Company*, 286 F.3d 661 (3d Cir. 2002) for the proposition that the "economic loss" doctrine bars plaintiffs' UTPCPL claims. In *Werwinski*, the Third Circuit Court of Appeals held that the UTPCPL claims before them, which were based on fraudulent misrepresentations in a car purchase, were barred by the

doctrine. The court predicted that the Supreme Court of Pennsylvania would apply the doctrine to the UTPCPL, even though no Pennsylvania court had done so. Since there was a split of authority among federal cases applying Pennsylvania law, the court looked to cases outside the jurisdiction, relying heavily on a federal case from the Western District of Wisconsin applying Wisconsin law. The *Werwisnki* decision is not binding on this court, and for the reasons discussed below, I do not find it persuasive.

First, if either of these doctrines were held to apply to the UTPCPL, it would run contrary to the clear intent of the legislature in enacting the UTPCPL and significantly lessen, if not eviscerate, the utility of the law and its ability to fulfill its intended purpose. Defendants would have this court hold that the UTPCPL is unavailable to plaintiffs who suffer only an economic loss and/or plaintiffs who have a contract dealing with the subject matter of the UTPCPL claim. However, the UTPCPL is a remedial statute designed to discourage and remedy fraudulent and deceptive trade practices. In writing a statute dealing with fraudulent and deceptive business practices, the obvious intent of the legislature was to protect those engaged in trade, many of whom will contract with their defrauder, and provide a remedy for people who suffer from the ordinary incidents of deceptive trade practices, *i.e.*, monetary losses. Applying either the "economic loss" doctrine or the "gist of the action" doctrine to the UTPCPL would limit claims under the act to a very narrow class of potential plaintiffs, which was obviously not intended by the legislature.[7]

---

7. Limiting the class of plaintiffs in this way runs afoul of the clear language of the statute, as "[t]here is no indication of an intent to exclude a class or classes of transactions from the ambit of the Consumer Protection Law" because "[w]hen the Legislature deemed it necessary to make an exception from the law's scope, it did so in clear language."

It is clear that the UTPCPL was intended to be interpreted broadly. Our own Supreme Court has noted that some of the Act's "expansive provisions reflect the legislative judgment that unfairness and deception in all consumer transactions must be halted" and that "[t]hese sections of the consumer protection law, in accordance with the legislative intent, are to be liberally construed to effectuate that intent." *Id.*, at 817. If the law is to be liberally construed to effectuate the legislature's intent, then interpreting it in a way that bars the majority of potential claimants from utilizing it undoubtedly runs counter to that legislative intent.

Moreover, I am hesitant to use a purely judicial doctrine to limit the will of the legislature.[8] In refusing to follow *Werwinski*, Judge Antwerpen, then a federal district court judge, correctly noted that "Pennsylvania's statutory construction statute clearly bars applying common law doctrine to overturn legislative acts enacted after September 1, 1937." *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 275 (E.D. Pa. 2003). As he observed, 1 P.S. §1921 provides "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing the spirit" and §1928(a) states that "[t]he rule that statutes in derogation of the common law are to be strictly construed, shall have no application to the statutes of this Commonwealth enacted finally after

---

*Commonwealth, by Creamer v. Monumental Properties, Inc.*, 329 A.2d 812, 834 (Pa. 1974). Since there is no language in the statute suggesting that it should be limited to situations involving more than economic losses or plaintiffs who did not have a written contract, applying the doctrines defendants advocate would amount to a massive judicial revision of the statute.

8. I am especially hesitant to do so with a judicial doctrine that originated in a largely unrelated area of the law, as the "economic loss" doctrine did.

September 1, 1937."[9] *Id.* Judge Antwerpen also pointed to 1 P.S. §1922(2), which states that "[i]n ascertaining the intention of the general assembly in the enactment of a statute the following presumptions, among others, may be used.... (2) That the general assembly intends the entire statute to be effective and certain." *Id.* Limiting the clearly-articulated remedy adopted in the UTPCPL based solely on judicially-created doctrines would run afoul of these codified principles of statutory construction and, in my judgment, would constitute an unnecessary encroachment into the authority of the legislature.

Defendants cite no binding precedent applying either the "economic loss" doctrine or the "gist of the action" doctrine to claims under the UTPCPL. In enacting the UTPCPL, the legislature's intent was "to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices." *Monumental Properties*, at 815-16. The statute represents a belief on the part of the legislature that "unfairness and deception in *all* consumer transactions *must be halted.*" *Id.*, at 17 (emphasis added). I will not dilute and derogate the remedy the legislature designed to achieve that noble goal in the absence of clear and persuasive authority mandating such a result.

3. Defendants' Request to Strike Entry of Judgment on the Jury Verdict

Defendants contend that the court committed an error of law by entering judgment on the claims tried by the jury. However, the court did not intend to enter judgment on those claims. What defendants complain of is the phrasing of the court's "final verdict." There is language suggesting that judgment was entered by the court's final verdict.

---

9. As he later noted, the UTPCPL was adopted in 1968.

However, the final verdict was not intended to enter a final *judgment*, but instead enters a final *verdict*, and the language defendants cite, "and judgment is entered," will be stricken to avoid confusion.

4. Defendants' Challenges to the Court's Findings re Piercing the Corporate Veil

Defendants make numerous challenges to the court's factual and legal findings in this case. They also claim that the court abused its discretion by drawing various "unwarranted and unsupported inferences and deductions from its factual findings." They ask the court to set aside the portion of the adjudication that found Messner liable for breach of contract on a theory of piercing the corporate veil. For the following reasons, I decline to do so.

First, defendants argue that the court abused its discretion by drawing certain inferences regarding the shareholder loans Messner took from SCCS in years prior to 2007. However, defendants do not point to a single instance where the court drew such an "unsupported inference." Instead, they allege generally that the court inferred that the loans were responsible for SCCS's financial difficulties in 2007 and 2008. The court drew no such inference. It merely pointed out the fact that Messner had transferred Northgate funds to SCCS in an amount similar to the amount he owed SCCS and commented on the obvious, that the transfers would not have been necessary but for his shareholder loans. That is not to say the shareholder loans caused SCCS's financial decline, but only that they would have had an amount of funds close to the amount Messner transferred from Northgate had he not taken his shareholder loans. That taking hundreds of thousands of dollars from a company would negatively impact the company's capital is beyond

dispute. Contrary to defendants' assertions, the court expressly acknowledged that, while the shareholder loans obviously contributed to SCCS's financial position, other factors contributed as well. Adjudication, at 24. Thus, the court made no finding and drew no inference that SCCS was failing solely because of Messner's shareholder loans.

Moreover, the nature of an "inference" is that it is drawn or deduced from other facts. The court was free to draw inferences on Messner's use of the corporate form from facts regarding substantial shareholder loans he made in years prior, especially since his main defense to these actions was that he was not benefitting himself by transferring Northgate funds to SCCS, a company defendants claimed needed funds due *solely* to unpredictable economic forces. Perhaps more important, defendants did nothing to dispel the "inference" they claim was drawn even though they possessed, or at least had access to, the information to do so, *i.e.*, they cannot now complain that inferences were drawn based on incomplete information when they possessed the ability to complete it.

Next, defendants claim the court abused its discretion in making its factual findings regarding Messner's knowledge that he would be transferring significant sums of Northgate funds to SCCS and that the additional monies from plaintiffs would not speed up construction. The former finding is supported by the temporal proximity between plaintiffs' payments and the transfers, and the appropriateness of that finding is not diminished by the fact that the amount of funds transferred to SCCS did not equal the amount plaintiffs paid, as the finding states Messner "knew that he would be transferring *significant amounts of money* to SCCS," not "he knew he would be transferring *all of Plaintiffs' funds* to SCCS." Adjudication,

at 9. As to the latter, defendants cite evidence that, at first blush, can be seen as contradicting the court's finding that Messner knew additional funds would not speed up construction. However, the court's finding was based on the totality of the evidence, not just that evidence cherry-picked by defendants to support their position, including, *inter alia,* the overwhelming evidence of Northgate's indebtedness and declining financial position, as well as the status of SCCS and the Northgate funds that had been used to keep it afloat. *See, e.g.,* D-46 (Northgate checking account statements) and P-34 (K&D statements of account for Northgate). Defendants appear to conflate two distinct concepts: knowledge that additional monies would not be used for any Northgate expenses and knowledge that additional monies would not be used to "speed up" construction. The court found the latter, which has ample support in the record, as the evidence shows that Messner knew the project was significantly over budget, that the general contractor was owed a substantial sum of money and had already stopped certain work due to nonpayment once before, and that the project was maxed out on its loans from Susquehanna Bank and could be foreclosed in the very near future.

Defendants also dispute the court's finding that Northgate was not entitled to the additional payments from plaintiffs under the contract. This issue is dealt with in the court's adjudication. Defendants point out that the agreement states that the money for "customizing work costs and costs for optional upgrades" will be due "upon the signing of a customizing amendment." P-1 (agreement of sale). However, as noted in the adjudication, there must be something to amend that is already in existence in order to have an amendment. Also, the agreement clearly states that the "[a]mount set forth in item 3B of the schedule

[is] earnest money," and the "[p]urchaser agrees to pay the balance due at settlement." N.J.T., day 1, 53; P-1. Moreover, the first page of the agreement lists the price of the unit as $1,150,342, and the attachment to the contract, which includes all the work defendants claim was done pursuant to "customizing amendments," was not labeled or otherwise referred to as a "customizing amendment" and shows a $1,150,342 "base" price for the unit. *Id.* Therefore, under the contract, $1, 150,342 is the "base price" of the unit, regardless what Mrs. Carruthers may have thought.

Next, defendants contest the court's findings nos. 8 and 9 regarding Messner's conversation with Mrs. Carruthers during which he stated he had funds to finish the unit "at any time," which the court found as a fact, and the court's finding that Messner knew the statement was misleading when he made it.[10] This issue was fully dealt with in the adjudication. The financial records, and even Messner's own admissions, clearly demonstrate that Northgate was not in a financial position to complete plaintiffs' unit "at any time." D-46. Thus, there is ample evidence to support the court's finding that Messner knew that statement was misleading when he made it. As to the finding that the conversation took place, that finding was supported by the persuasive testimony of Mrs. Carruthers. Notes of Jury Trial Testimony ("N.J.T."), day 2, 35.

Defendants next challenge the court's findings regarding Messner's use of the Northgate funds,

_____

10. They also appear to challenge the court's inference that plaintiffs relied on this statement. However, this is discussed at length in the adjudication. The September payment was not the only action plaintiffs took relying on the statement. Moreover, as discussed *infra*, simply because the September payment was solicited through a letter from counsel does not mean plaintiffs did not rely on Messner's prior statements in making it.

specifically the findings that he did not use the funds to benefit Northgate and that the transfers to SCCS were made to protect Messner's personal interests by satisfying the debts of the secured creditors at the expense of the unsecured creditors. The transfer of Northgate funds to SCCS protected Messner's personal interests by keeping SCCS alive as a viable business, thereby avoiding, or at least postponing, a default on the secured loans, and since the unit was never completed, and the parties never settled, the increased property value from the work on the unit went to the bank, partially relieving Messner of his obligations as guarantor of the project. Therefore, the transfers did benefit the secured creditors, and this was done at the expense of the unsecured creditors because that money was obviously no longer available to satisfy plaintiffs' claims.

Defendants' next claim is that the court abused its discretion by drawing the inference that Messner obtained $325,000 from plaintiffs "by making false and deceptive assurances." Adjudication, Sept. 13, 2013, at 14. Defendants claim that this "inference," which was written as a mere summation and simplification for purposes of introducing the analysis that follows, is unwarranted and an abuse of discretion because the $150,000 was prompted by a letter from Northgate's counsel and because that $150,000 was used "primarily for plaintiffs' unit." First, the letter may have preceded plaintiffs' payment, but the court was free to weigh the totality of the evidence to determine why plaintiffs ultimately felt comfortable making that payment. Second, the fact that Northgate used $100,000 from its account to pay K&D after the $150,000 payment from plaintiffs does not render Messner's statements truthful and accurate. He still made false and deceptive assurances about the effect the money would

have and the financial position of the Northgate project. Finally, contrary to defendants' assertions, this inference is not incompatible with the fact that the sum of money obtained from plaintiffs was less than the sum transferred to SCCS. Plaintiffs gave Messner funds for the unit, and Messner misled them about the effect those monies would have. The statements are not any less misleading merely because he did not transfer the exact dollar amount plaintiffs gave him for their unit.

Defendants argue that the court abused its discretion and made an error of law by finding that Messner intermingled his corporate and personal affairs. They claim that the evidence was insufficient to support that finding because there was no evidence that Messner intermingled his personal assets with those of Northgate or diverted funds to pay for his personal expenses. This is an oversimplification of the "intermingling" factor for piercing the corporate veil. For the reasons discussed fully in the court's adjudication, Messner did substantially intermingle his personal affairs with the corporate affairs of Northgate by, *inter alia*, giving away Northgate funds, without any terms for repayment or security of any kind,[11] solely to benefit another failing company he owned, a company Northgate had no contractual relationship with or duty to. The substantial intermingling is even more obvious when one considers Messner's massive outstanding shareholder loan from the company he gave Northgate funds to. P-179 (SCCS corporate tax return for 2007). UNCB held a mortgage on Messner's personal residence as security for the loans to SCCS. P-117 (UNCB forbearance agreement); P-101-103 (UNCB loan agreements). Thus, the ability to stave off an SCCS default

---

11. Notes of non-jury trial testimony ("N.T."), 33, 69.

was much more than the "attenuated" personal benefit defendants suggest it was.

Defendants next challenge the court's finding that Northgate was undercapitalized. They argue that the court interpreted undercapitalization too broadly under the case law. However, like they do in other parts of their post-trial motions, they make this claim without citing the case law they are referring to. Regardless, the court cited various authorities to demonstrate the relevance of subsequent undercapitalization occurring as a result of the self-interested conduct of the owner.

Next, defendants argue the court abused its discretion in considering Northgate's failure to follow proper, but not required, corporate formalities. The language "proper" comes straight from *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893 (Pa. 1995),[12] and in any event, the *Lumax* inquiry is essentially a look into whether the owner has abused the corporate form. In making such a determination, one must consider whether the owner observed proper formalities, even if those formalities are not required by law, especially in the case of an LLC where there are very few legal requirements. Defendants also argue that the failure to observe proper corporate formalities did not lead to the loss in this case. First, Northgate's corporate veil was not pierced solely because of Messner's failure to observe proper corporate formalities. Regardless, had Messner observed such proper formalities as creating a loan agreement with security for the loans Northgate made to SCCS, it is possible that plaintiffs would have been able to recover their losses from Northgate. In that sense, the failure to follow proper formalities did lead to the harm

_____
12. The *Lumax* factors are reviewed in the adjudication in the court's piercing analysis beginning at page 11.

they suffered.

Defendants next challenge the court's finding that Messner engaged in fraud when he made representations to Mrs. Carruthers about his ability to complete the unit. Plaintiffs first claim that Messner's statement could not have been relied upon because no payments were made after the statement until September, and that payment, defendants claim, was the result of Northgate's counsel's letter on August 21, 2008. First, the adjudication fully addressed these issues, explaining that plaintiffs relied on Messner's misrepresentations in more ways than giving the extra funds, *to wit*, making various purchases specifically for the unit,[13] and the fact that the September payment was preceded by counsel's August 21, 2008 letter does not mean that Messner did not solicit the payment, nor does it mean that plaintiffs did not rely on Messner's prior assurances in deciding that it was a wise use of $150,000.

Defendants further dispute the court's finding of fraud by arguing that the court ignored the actual work and efforts of Northgate to complete the unit and the *bona fides* of the Northgate project, that the court did not base its finding on clearly-established facts meeting the clear and convincing standard, and that there was no proof of scienter. However, the evidence shows that Messner made statements about the viability of the Northgate project and the effect plaintiffs' payments would have on the project, knowing that the Northgate project was maxed out on its loans and substantially behind on its payments to the general contractor, in order to obtain money to help support another business he owned. Thus, there is ample

---

13. As noted in the adjudication, plaintiffs spent $27,399.27 on two tile purchases in September and November of 2008. P-14; P-15; N.J.T., day 2, 69.

evidence from which to conclude that he made knowing misrepresentations with the intent to defraud plaintiffs. Regardless, in requesting judgment on this basis, defendants overlook the fact that piercing the corporate veil does not require proof of fraud.[14]

Defendants challenge the court's analysis of considerations beyond those articulated in *Lumax*. Defendants suggest that this approach, taken directly from the Superior Court's analysis in *Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87 (Pa. Super. 2007), is somehow incompatible with *Lumax*. I disagree.

First, piercing the corporate veil is an amorphous equitable remedy that is not susceptible to the kind of cookie-cutter, checklist analysis defendants argue should have been used in this case. Equitable remedies are inherently amorphous, but piercing the corporate veil is much more so than the average equitable remedy. It is a doctrine that has produced a list of two dozen different considerations by courts attempting to address the same essential question. Thus, limiting the analysis to the four considerations our Supreme Court chose to make explicit in one decision misconceives the nature of the inquiry.

Moreover, nowhere in the *Lumax* decision did our Supreme Court limit the analysis for piercing the corporate veil to the four factors articulated therein. To the contrary, after listing the four factors that are now referred to as the "*Lumax* factors," the court cited *Watercolor Group v. Newbauer*, 360 A.2d 200, 207 (Pa. 1976), noting its holding that the "corporate veil may be pierced whenever one in control of a corporation uses that control or corporate

---

14. *Vill. at Camelback Prop. Owners Assn. Inc. v. Carr*, 538 A.2d 528, 533 (Pa. Super. 1988) *aff'd sub nom. Vill. at Camelback Prop. Owners Ass'n, Inc. v. Carr*, 572 A.2d 1 (Pa. 1990).

assets to further his personal interests." *Lumax, supra,* at 895. Thus, the court appears to have acknowledged, at least implicitly, the amorphous nature of the veil-piercing remedy.

Finally, the court used binding precedent in its analysis of considerations beyond the *Lumax* factors; these inquiries were not chosen at random. The *Lumax* factors are admittedly designed to assist the court in focusing its inquiry. However, there appeared to be no intent on the part of the *Lumax* court to dispose with the prior case law elaborating on the doctrine.

## II. Plaintiffs' Post-Verdict Motions:

1. Plaintiffs' Request for Judgment on Conversion Claims Dismissed at Trial

Plaintiffs claim that they are entitled to judgment on the conversion claims against Messner and Northgate. On motion by defendants, the court dismissed these claims at trial based on the "gist of the action" doctrine. That decision stands.

The "gist of the action" doctrine precludes a plaintiff from bringing a suit in tort for duties that arise from a contract. As the Superior Court has explained:

[A]lthough mere non-performance of a contract does not constitute a fraud, it is possible that a breach of contract also gives rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed

by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.

*eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002).

Contrary to plaintiffs' arguments, the duties of Northgate, and Messner as managing member thereof, to use the funds given to it by plaintiffs for the purpose of constructing the condominium have their basis in the contract itself. Plaintiffs agreed to give Northgate a sum of money, and Northgate agreed to construct a condominium for them. Plaintiffs do not seek relief merely because the funds they provided were not used for construction of their home. Had Northgate completed their unit, plaintiffs would have no claim against Northgate based on how Northgate's funds were disbursed. It is Northgate's alleged failure to complete their unit, a duty imposed by the contract, that is the basis for their claims. That is not to say that there is no tort here. However, the alleged conversion is "inextricably intertwined" with the contract claim,[15] and as a result, the "gist of the action" doctrine precludes recovery in tort.

Plaintiffs' argument, if accepted, would have the potential to create separate tort liability in any garden-variety breach of contract case where the defendant used the plaintiff's funds for anything other than what was contracted for. This is exactly what the "gist of the action" doctrine was designed to prevent. Funds received by a business in a given transaction will rarely be kept isolated from other funds and used solely on the product or service

___

15. *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 21 (Pa. Super. 2002).

of the individual who provided them. Most businesses, like Northgate, compile the majority of their revenues and pay expenses from that combined source of funds. Doing otherwise would essentially require separate accounts for each customer. Since this would be completely impractical for most businesses, the result of plaintiffs' position on this issue would be separate tort liability, and an end-run around the "gist of the action" doctrine, for a wide range of cases where the true gist of the action is in contract, not in tort.

2. Plaintiffs' Request for Judgment on Unjust Enrichment Claim Against Messner and Against SCCS and Group

Plaintiffs claim that the court erred in denying them unjust enrichment against Messner. This issue was fully addressed in the court's adjudication. To be sure, Messner did benefit from plaintiffs' additional funds. However, there is no evidence establishing an amount by which plaintiffs enriched defendant Messner.

Plaintiffs claim that the value of the benefit they conferred on Messner was *either* the $425,000 they gave to Northgate *or* the amount their monies improved the value of the property, which they claim to be "approximately $500,000." They argue that the temporal proximity between the delivery of their funds to Messner and Messner's transfer of Northgate funds to SCCS show that their funds were given to SCCS. In the alternative, they argue that the funds were used to improve the property, partially relieving Messner of personal liability as a guarantor of the loans. Plaintiffs are certainly allowed to argue in the alternative; however, for the reasons set forth in the adjudication, it remains the position of the court that plaintiffs' ability to argue two opposing scenarios confirms

that neither can be established with any certainty.

Plaintiffs contend that the amount they benefitted SCCS and Group can be calculated. However, as discussed above and in the adjudication, the exact amount of their funds that went to SCCS, and benefitted group as a result, cannot be proven with sufficient certainty to be the basis for an award.

3. Plaintiffs' Request for Successor Liability of Group for the Debts of SCCS

Plaintiffs claim that the court erred in failing to find group liable for the debts of SCCS on the basis of successor liability. However, as discussed herein, the court properly denied plaintiffs relief on their claims against SCCS. Therefore, there was no basis to hold Group liable as a successor of SCCS.

4. Plaintiffs' Request for Court Determination of Damages for UTPCPL Claims

Plaintiffs claim that the court erred in refusing to override or nullify the verdict rendered by the jury. This issue is fully dealt with in the court's adjudication, and for the reasons stated therein, there is no error.

5. Plaintiffs' Request for Liability of SCCS and Group on the Basis of "Reverse Piercing" and the "Enterprise Theory" of Piercing the Corporate Veil

Plaintiffs complain the court erred in refusing to apply the "reverse piercing" and "enterprise" theories of piercing the corporate veil. As discussed in the adjudication, however, these theories have not been adopted in Pennsylvania. Thus, the court did not err in refusing to use them as a basis for liability.

6. Plaintiffs' Requests for Pre-judgment and Post-

Judgment Interest

Subsequent to the adjudication, plaintiffs moved for pre and post judgment interest on the jury's award of $525,431.19 for breach of contract. A supportive pre-evidentiary hearing brief was filed by plaintiffs and formally responded to in kind by defendants. An evidentiary hearing was held October 30, 2013. In their response and at the hearing defendants conceded plaintiffs' entitlement to pre-judgment interest differing with plaintiffs only as to from when interest should begin to run. Plaintiffs seek interest to run from when their various payments to defendants Northgate and Messner were made; defendants concede that interest should run from the date of breach which, for convenience of calculation, they set (without prejudice to contest the judgment) as November 30, 2008.[16] Given that concession I need not consider defendants' position on the issue further. However, I reject plaintiffs' claim for earlier calculations of interest accepting defendants' position that prior to that date there was still some work being performed on plaintiffs' unit. By that date it was clear nothing more was or would be done and a breach and duty to return funds plaintiffs advanced clearly arose.[17] Defendant calculates pre-judgment interest from November 30, 2008 on the breach of contract award of $525,431.19 at the legal rate of 6% for a pre-judgment interest award of $150,564.20. Plaintiffs have no dispute with the calculation other than the start date. The court accepts the calculation and will award pre-judgment interest in that amount.

16. *See* defendants' post adjudication brief filed October 18, 2013, p. 1 & 2.
17. In October plaintiffs signed off on the cabinet order, the order was placed, floor was installed and stained. Cabinets were ready for delivery early December and defendant Northgate gave notice of termination December 12, 2008.

The parties agree that post-judgment interest follows the judgment and post-judgment interest accrues at the rate of $79.372 per day.[18]

7. Plaintiffs' Request for Attorney's Fees

Having obtained a jury award on the UTPCPL claim against defendants Northgate and Steven R. Messner, plaintiffs seek an award for attorney's fees related to that claim which fees may be awarded pursuant to §201-9.2 of the act.

In considering such an award the court is required to consider several factors, known as "McCauslin Factors" as set forth in *McCauslin v. Reliance Finance Co.*, 751 A.2d 683 (Pa. Super. 2000). In essence these factors include the nature of the work performed, the novelty and difficulty of the issues involved, the time expended, and reasonableness of the fees charged. Plaintiffs' fee request for UTPCPL work is for $86,993.75 plus $3,712.05 for costs. Defendants oppose the request but not as contrary to the "McCauslin Factors." Defendants object that the fee request lacks any "sense of proportionality", is wholly out of proportion to the jury's actual UTPCPL damage award of $100 against defendants Northgate and Steven R. Messner, and is not limited to fees attributable only to the UTPCPL claim.

The requirement of a "sense of proportionality" comes from *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022 (1031-32 Pa. Super. 2005). While *Neal* points out that a direct proportionality is not required, nor does the damage award cap the fees that may be awarded, *Neal* does require that there must be a "sense of proportionality" between the

---

18. *See* parties post adjudication briefs on the subject of interest at exh A in each brief.

two amounts. *Id.* at 1031. The case law does not define exactly what the requirement means; however, it clearly does link the amount of a fee award to the verdict.

Any analysis must begin with what was the UTPCPL award. The jury's verdict was $100 as to each defendant. This award was made after instruction by the court in response to a jury question, that they are required by the statute to award at least $100. They chose to award no more. Plaintiffs would not stop at $100 but contend the jury's intent was to award the same amount as was awarded for breach of contract but as they didn't want to make a double award they awarded the nominal statutory $100 against each defendant for a total of $200. Plaintiffs' contention was reviewed in depth and rejected in the adjudication dated September 13, 2013. For all the reasons set forth in the adjudication, at pages 45-48 which denied plaintiffs' motion to mold the jury verdict to increase the UTPCPL damages to the breach of contract amount, plaintiffs' contention is again rejected here. Thus the UTPCPL award must be viewed as it was rendered in the nominal amount of $100 each for defendants Northgate and Steven R. Messner.

Comparing plaintiffs' $90,000[19] attorney's fees and costs request to the nominal $100 (or $200) UTPCPL award results in a fee award that is 450 times higher than the UTPCPL award ($90,000 ÷ 200 = 450). No conceivable interpretation of *Neal*'s "sense of proportionality" requirement can consider a 450 multiple in favor of fees sensible or reasonably proportional to the award. Thus, plaintiffs' $90,000 fee and cost request must be deemed as so wholly out of proportion as to be not sensibly proportional to the UTPCPL total award of $200. The

---

19. Fees and costs are rounded off for ease of calculation.

requested fees must therefore be denied in the amount claimed for that reason alone.

An additional problem with plaintiffs' fee request is that plaintiffs acknowledge the work on the UTPCPL claim also was essential to the successful pursuit of their breach of contract claim and piercing the corporate veil remedy. *Neal supra*. requires that fees may not be awarded for work expended on non-UTPCPL claims. Plaintiffs' attempt to comply with this requirement for work admittedly necessary to prove and pursue all their claims by assigning a percentage of such work, typically 50%, to just the UTPCPL claim. Any percentage is speculative, but given the my review of the fee submission and seeing how the evidence was marshalled and presented at trial, a 1/3 (33%) allocation to the UTPCPL claim and 2/3 to the breach claim and piercing remedy seems more reasonable. However, even a 1/3 allocation reducing claimed fees and costs to $30,000 lacks sensible proportionality as it results in a fee award 150 times the nominal damages.

Having conducted all pre-trial proceedings and the trial in this case, I have observed plaintiffs' counsel's work and find it exemplary. Obtaining the jury award for breach of contract against the corporate defendant Northgate and succeeding before the court non-jury in piercing the corporate veil to hold defendant Steven R. Messner personally liable for that judgment took considerable effort and skill. However, that work cannot be compensated with a fee award because the work was also necessary to be performed and essential to a UTPCPL successful verdict. A fee award must stand on the UTPCPL award alone. Since that award is nominal so must be the fee award if proportionality is to mean anything.

Constrained by the law, but recognizing that counsel

earned every penny of their fee request, I can do no more than award counsel fees for the UTPCPL claim, in a sensible proportion of 5 times the UTPCPL award, in the amount of $1,000 each against defendants Northgate and Steven R. Messner which, under the circumstances, I consider nominal.

Accordingly, I enter the following:

ORDER AND JUDGMENT

And now, this 19th day of November, 2013, upon consideration of the post-trial motions of plaintiffs Ralph Carruthers and Carol Carruthers and defendants Messner Enterprises Northgate, LLC, Steven R. Messner, S.C.C.S., Inc., and JR Transportation Group, Inc., it is hereby ordered and decreed that the post-trial motions are disposed of as follows:

I. Defendants' motions:

1. Defendants' motion for a new trial on the breach of contract claims against defendant Messner Enterprises Northgate, LLC is denied;

2. Defendants' motion to set aside the jury verdict on plaintiffs' claims under the unfair trade practices and consumer protection law is denied;

3. The language "and judgment is entered" at paragraph A of the court's final verdict dated September 13, 2013 is hereby stricken so as to reflect that a verdict, not a judgment, was entered;

4. Defendants' motions to set aside the court's verdict on count II, breach of contract holding defendant Steven R. Messner personally liable on the theory of piercing the corporate veil, challenging the basis of the

court's findings, the inferences drawn therefrom, and the analysis it employed are denied;

II. Plaintiffs' motions:

1. Plaintiffs' request for judgment on their conversion claims is denied;

2. Plaintiffs' requests for judgment on their unjust enrichment claims against defendant Steven R. Messner, defendant S.C.C.S., Inc., and defendant JR Transportation Group, Inc. are denied;

3. Plaintiffs' request for successor liability against JR Transportation Group, Inc. is denied;

4. Plaintiffs' request for court determination of damages on the unfair trade practices and consumer protection law claims, or in the alternative, molding of the jury verdict to reflect $525,431 in damages on those claims, or in the alternative, a new trial on damages for those claims is denied;

5. Plaintiffs' request for liability of defendant SCCS Inc. and J.R. Transportation Group, Inc. under the "reverse piercing" and "enterprise" theories of liability is denied;

6. Plaintiffs' motion for prejudgment interest is granted and pre-judgment interest is awarded in the amount of $150,564.20; and

7. Plaintiffs' motion for attorney's fees on the UTPCPL award are awarded in the amount of $1,000 each against defendants Northgate and Steven R. Messner.

Accordingly, I enter the following:

JUDGMENT

Judgment on the Final Verdict rendered on September 13, 2013 is entered as follows:

1. On counts I and II of plaintiffs' amended complaint, breach of contract, in favor of plaintiffs Ralph Carruthers and Carol Carruthers and against defendants Messner Enterprises Northgate, LLC and Steven R. Messner, jointly and severally, in the amount of $525, 431.19, together with prejudgment interest at the legal rate from November 30, 2008, in the amount of $150,564.20 for a total award of $675,995.39 plus post-judgment interest at the rate of $79.372 per day, and court costs;

2. On counts VII and VIII of plaintiffs' amended complaint, violation of the UTPCPL,[20] in favor of plaintiffs and against defendant Messner Enterprises Northgate, LLC in the amount of $100, and against defendant Steven R. Messner in the amount of $100, jointly and severally, together with interest at the legal rate from June 28, 2013, plus attorney's fees in the amount of $1,000 each against defendants Northgate and Steven R. Messnern plus court costs;

3. On all remaining counts of plaintiffs' amended complaint in favor of defendants Messner Enterprises Northgate, LLC, Steven R. Messner, S.C.C.S., Inc., and JR Transportation Group, Inc. as to each defendant appropriate to each count[21] and against plaintiffs Ralph Carruthers and Carol Carruthers; and

4. On defendant Messner Enterprises Northgate, LLC's counterclaim against plaintiffs in favor of plaintiffs

---

20. Unfair trade practices and consumer protection law, 73 P.S. §§201-1 *et seq.*

21. *See* the adjudication dated September 13, 2013 and the foregoing order for more specificity of counts and defendants to which they relate.

Ralph Carruthers and Carol Carruthers and against defendant Messner Enterprises Northgate, LLC.