J-A09037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DELAWARE COUNTY SOLID WASTE AUTHORITY | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| EVERGREEN COMMUNITY POWER, LLC | : : : | No. 967 EDA 2021 |
| Appellant | : : | |

Appeal from the Judgment Entered July 1, 2021
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  CV-2016-007636

BEFORE:  NICHOLS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:              **FILED APRIL 27, 2022**

Evergreen Community Power, LLC (Evergreen) appeals from the judgment[1] entered in the Court of Common Pleas of Delaware County (trial court).  The court's decision found in favor of Delaware County Solid Waste Authority (the Authority) in the amount of $104,525,20 for Evergreen's breach

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Evergreen filed its notice of appeal prior to filing a *praecipe* for entry of judgment on the verdict.  An appeal properly lies from entry of judgment and not the denial of a post-trial motion.  ***See Harvey v. Rouse Chamberlin, Ltd.***, 901 A.2d 523, 524 n.1 (Pa. Super. 2006).  However, Evergreen's premature notice of appeal does not affect our jurisdiction as a *praecipe* and judgment were filed on July 1, 2021.  ***See*** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").  We have amended the caption accordingly.

of the parties' 2016 Ash Disposal Agreement (the Agreement) for non-payment of past due fees. The decision also found in favor of Evergreen and against the Authority on Evergreen's counterclaim for the Authority's breach of the Agreement for failing to mail notice of Prohibited Waste pursuant to the Agreement's specific terms, but found that Evergreen was unable to recover the alleged damages because of the Limitation of Liability section of the Agreement. We affirm.

We take the following factual background and procedural history from the trial court's July 8, 2021 opinion and our independent review of the record.

## I.

## A.

The Authority is a municipal corporation organized under Pennsylvania law that operates the Rolling Hills Landfill (the Landfill) in Earl Township, Pennsylvania. (**See** Agreement, 12/11/15, at 1). Evergreen is a limited liability company that removed solid waste ash from a residual waste and biofuel-to-energy facility in Reading, Pennsylvania. (**See id.**). On December 11, 2015, the parties entered into the Agreement.[2]

Pursuant to the Agreement's terms, Evergreen was to deliver a minimum of 10,000 tons of ash to the Landfill between January 1, 2016, and

---

[2] The parties had been entering and renewing these yearly agreements since 2011.

December 31, 2016, and pay the Authority $28.75 per ton. (*See id.* at ¶¶ 1, 3(a)). The Authority billed Evergreen monthly, with payments to be made within thirty days. (*See id.* at ¶ 4).

The moisture content of the ash was not to exceed twenty-five percent and, if Evergreen delivered ash that the Authority "determine[d] to be Prohibited Waste," Evergreen was responsible for "[a]ny cost of storage, removal, treatment or disposal" of it. "Prohibited Waste" included "any … material that the [Authority] reasonably concludes would require special handling or present an endangerment to LANDFILL, the public health or safety, or the environment." (*Id.* at ¶ 7); (*see id.* at ¶ 1(f)).

The Agreement also provided "Events of Default." Paragraph 10 provided, in relevant part, that the Authority defaulted if it failed "for a period of fifteen (15) consecutive days to accept deliveries of waste at LANDFILL substantially in accordance with the terms and conditions of this Agreement." (*Id.* at ¶ 10(a)(2)). If an Event of Default pursuant to Paragraph 10(a)(2) occurred, Evergreen had a right, "upon prior notice," to the Authority to terminate or suspend its obligations under the Agreement and/or pursue all remedies available to it at law or in equity. (*Id.* at ¶ 10(b)).

Paragraph 11 provided, in pertinent part, that an "Event of Default" occurred if Evergreen (1) failed "to make payment of any overdue fee within ten (10) days following receipt of written notice;" or (2) upon the "[d]elivery by [Evergreen] … of any Prohibited Waste pursuant to this Agreement to

- 3 -

LANDFILL on a repeated basis followed by the repeated failure of Evergreen to cure within a reasonable period following written notice from [the Authority] to [Evergreen] of delivery of such Prohibited Waste." (*Id.* at ¶ 11(a)(1), (2)). If such "Event of Default" by Evergreen occurred, "upon prior notice," the Authority was permitted to terminate the Agreement and/or pursue all remedies available at law or in equity. (*Id.* at ¶ 11(b)).

Pursuant to Paragraphs 12 and 25:

If either party [materially] breache[d] this Agreement and fail[ed] to cure such breach within 30 days, after receipt of written notice of such breach from the non-breaching party, except as provided for herein, this Agreement may be terminated by the non-breaching party in accordance with the provisions of Section 10 b) and 11 b) above.

* * *

A non-breaching party under this Agreement may terminate this Agreement by delivering written notice of termination to the breaching party upon any material breach or default of this Agreement by the breaching party that is not cured in the time frame set forth herein. The preceding specifically includes, but is not limited, the right of [Evergreen] to terminate for a failure by [the Authority] to accept the agreed to Ash quantities and/or failure by [Evergreen] to timely pay all Fees in accordance with this Agreement's requirements. Upon termination or expiration of this Agreement, all amounts due from [Evergreen] under the terms of this Agreement shall be due and payable immediately to the [Authority].

(*Id.* at ¶¶ 12, 25). Any notices required by the terms of the Agreement to be sent to Evergreen were to be sent via first-class mail to Steven Simmons, Fuel Manager, Evergreen Community Power, 800 South Street, Reading, PA 19602. (*See id.* at ¶ 30). The limited liability provision at Paragraph 26 precluded

- 4 -

either party from recovering indirect or consequential damages, including, without limitation, "loss of use or lost business, revenue [or] profits" even if the party knew or should have known of the possibility of such damage. (*Id.* at ¶ 26).

**B.**

On September 2, 2016, the Authority filed a complaint against Evergreen for breach of the Agreement and *quantum meruit* for non-payment of invoices totaling $104,525.20 in tipping fees due for the deliveries of ash in February and March 2016. (*See* Complaint, 9/02/16, at ¶¶ 4-10, 13, 16-17). In its answer, Evergreen admitted that the Authority issued the subject invoices and that it did not pay them. It denied that the amounts billed were due and owing because Evergreen's performance was excused where the Authority breached or repudiated the Agreement by refusing the ash delivery on March 16, 2016, and continuing to do so despite Evergreen's March 28, 2016 notice of the breach. Evergreen counterclaimed for breach of contract, seeking damages in the amount of $106,159.80 for costs incurred in securing alternative waste disposal sites because of the Authority's breach of the Agreement. (*See* Answer, New Matter and Counterclaim, 1/24/17, at ¶¶ 4-8, 11, 13, 15, 17, 24-31, 35, 63, 64, 68-69). A two-day bifurcated non-jury trial was held on September 25, 2020, and November 8, 2020.

**C.**

Several Authority employees testified consistently about the issues with the ash, Evergreen's failure to mitigate them and meetings held by the parties at which the issues were discussed.

**1.**

Joseph Vasturia, the CEO of the Authority, testified that he had negotiated the yearly contracts with Evergreen since 2011, and that over time, Evergreen's ash had grown finer, blowing around the landfill because it was so dry. In 2015, a discount was negotiated into the contract to incentivize Evergreen to deliver better ash. He explained that if Evergreen delivered unacceptable ash, the Agreement permitted the Authority to reject the ash delivery. (*See* N.T. Trial, 9/25/20, at 44, 47-48).

Mr. Vasturia testified that William Cunningham and David Moser managed the day-to-day operations at the Landfill. In February 2016, they advised him that Evergreen delivered unacceptable ash that was causing equipment failures, and that "the ash was very dry and it was blowing all around, that the equipment operators were having trouble breathing, and I indicated to them that if it continued, we would have to stop accepting the ash because of my concern [] for the health of the employees." According to Mr. Vasturia, Evergreen was given several opportunities to correct the ash problem beginning on February 4, 2016 until mid-March when he advised Mr. Morgan, president and CEO of Evergreen, that the Authority would no longer

accept any ash due to the health issues it was causing to employees. (*Id.* at 52); (*see id.* at 49, 53, 56, 62-64).

Thereafter, on March 17, 2016, a meeting was held by representatives from the Authority and Evergreen at which Evergreen brought in test loads of ash that were again deemed unacceptable. (*Id.* at 53, 60-61). Furthermore, on March 17, 2016, Mr. Morgan mailed correspondence to Mr. Vasturia about the Authority's "failure to accept deliveries" and requested that this default be cured. (Correspondence, 3/17/16, at 1). On March 28, 2016, Mr. Morgan sent another letter in which he stated that the Authority "has informed [Evergreen] that it will no longer accept waste ash deliveries, which is a material failure" and if not cured within thirty days, Evergreen would terminate the Agreement, but hoped the parties "can come to an arrangement to avoid having to terminate the Agreement." (Correspondence, 3/28/16, at 1).

**2.**

David Moser, the Landfill's environmental manager, testified that he emailed Evergreen's plant engineer, Clifford Heistand, before a February 5, 2016 meeting between representatives of the Authority and Evergreen at which they discussed issues regarding the consistency of the ash and Evergreen's need to provide a solution to minimize the dusting problem. According to Mr. Moser, Evergreen did not make satisfactory efforts to mitigate the dust issue. He again emailed Mr. Heistand on March 15, 2016,

to advise the ash was continuing to cause a nuisance at the Landfill. (*See id.* at 200-03); (Exhibit P-8).

**3.**

The Authority's operations manager, John Knapp, testified that the ash delivered by Evergreen in 2016 was so hot that a driver would burn his hands if he touched the side of the trailer. The ash caused problems with Authority trucks and air filters and clogged the radiators. Mr. Knapp suffered throat problems himself, including a dry throat and inability to swallow because of Evergreen's ash. (*See id.* at 145-46, 148-49).

**4.**

Similarly, William Cunningham, the assistant Landfill manager, testified that the ash delivered by Evergreen was like talcum powder, causing equipment failure and employee health issues such as nose bleeds, sore throats and an inability to swallow. These issues were explicitly identified at the February 5, 2016 meeting with Evergreen, which did not follow up by remedying the problem. The problems were again discussed at a March 2016 conference call between representatives of Evergreen and the Authority. (*See id.* at 162-64, 167-68).

**D.**

Evergreen stipulated that it has not paid the overdue February and March invoices in the total amount of $104,525.20. (*See id.* at 29). Larry Haraschak, controller for Evergreen, testified that he was instructed to

withhold payments to the Authority in February and March 2016 for a total unpaid balance of $104,525.20. (**See** N.T. Trial, 11/18/20, at 122, 124).

Evergreen presented several witnesses who testified that they were aware of the Authority's problems with the ash and the limited mitigation efforts Evergreen undertook.

**1.**

Mr. Clifford Heistand, Evergreen's plant engineer, testified that the Authority advised him of concerns regarding ash being delivered to the Landfill at the meeting on February 5, 2016. Concerns about employee health and equipment issues were raised and he was aware that Authority operators were breathing in dust and experiencing sore throats. He acknowledged Evergreen was given at least forty days between early February to mid-March to mitigate the ash problem. Mr. Heistand testified that Mr. Moser from the Landfill sent him emails expressing concerns about the ash beginning on February 4, 2016, and advising that another solution must be undertaken to eliminate the nuisance the ash was creating. He sent an email on February 8, 2016, making it clear that Evergreen was aware of the issues identified by the Authority at the February 5, 2016 meeting. On March 16, 2016, Mr. Heistand received an email from Mr. Moser that stated the ash issue had not been remediated. (**See** N.T. Trial, 9/25/20, at 74-75, 97-99, 101-04); (Exhibits P-8, P-9, specifically 3/15/16 email entitled Subject Re: Increased water content in our ash).

**2.**

Pete Kline, Evergreen's plant manager, similarly testified that he was aware of concerns of the Authority regarding the ash delivered to the Landfill raised at the February 5, 2016 meeting although he did not attend. (*See id.* at 112-19, 130-31). Wesley Archambault, operations manager for Evergreen, testified that he was at the February 5, 2016 meeting and was aware of the ongoing ash issue. (*See* N.T. Trial, 11/18/20, at 49, 56).

**3.**

Evergreen's general manager, Chad Zablit, testified that he did not believe Evergreen needed to mitigate the dust problem because they paid a premium. He was not made aware of a meeting between Evergreen and the Authority in February 2016, although he admitted he was advised that there was a dusting problem. He acknowledged that remediating the issue would be very costly and that adding water to the ash was the only mitigation effort that Evergreen undertook. (*See* N.T. Trial, 9/25/20, at 234-36, 250).

**4.**

Evergreen logistics manager Ricardo Nieves coordinated to which landfill the ash went. He was aware of the Authority's concerns in 2016. He observed Evergreen ash being unloaded at the Landfill on March 11 and 16, 2016. Truck drivers had safety concerns about the ash being transported by Evergreen when the water content of the ash was at the maximum threshold of twenty-five percent and, therefore, it was reduced. His understanding was that after

the March 16, 2016 delivery, the Authority advised Evergreen that it would no longer accept ash deliveries. (**See** N.T. Trial, 11/18/20, at 6, 8, 10, 18, 27-28).

**5.**

In 2016, Pierre Fares took over the role of fuel sourcing manager at Evergreen[3] and was present at the February 5, 2016 meeting with the Authority and aware of the dusting problem. He spoke with Mr. Zablit about the problem and testified that mitigation efforts would result in higher transportation costs to Evergreen. He testified that there were email communications about the unacceptable ash and acknowledged that the Authority had given Evergreen at least forty days to correct the problem. On March 16, 2016, the Authority's CEO Joseph Vasturia and Rolling Hills Landfill Manager Joseph Sebzeda verbally notified Mr. Fares that the Authority would no longer accept any further waste deliveries from Evergreen unless they were specifically authorized before being scheduled. (**See id.** at 55-56, 74-75, 77, 81, 90, 97, 99, 109-11).

The Evergreen witnesses consistently testified that the only mitigation effort taken was to add water to the ash. (**See** N.T. Trial, 9/25/20, at 75,

---

[3] Stephen Simmons was Evergreen's fuel sourcing manager from 2013 through 2015. He testified that he negotiated the contract with Mr. Vasturia from the Authority and acknowledged that the Authority had requested Evergreen to remediate the dust. (**See** N.T. Trial, 9/25/20, at 34-35).

101, 109, 113, 122, 126-27, 222); (N.T. Trial, 11/18/20, at 52-53); (Exhibit P-9).

On March 5, 2021, the trial court issued a decision in which it made the following pertinent conclusions of law:

7. This court finds that [Evergreen] breached the [Agreement] by not tendering payment within 10 days as set forth in Paragraph 11(a)(1). [Evergreen] was required to remit $104,525.20 due to [the Authority] for 3,665.66 tons of ash that were delivered to the landfill.

\* \* \*

10. Section 11(a)(3) provides that cure and notice provisions shall not apply to defaults described in Sections 11(a)(1) and (2). **See** Exhibit P-1, p. 6; Section 11(a)(3). A clear reading of the [Agreement] provides that [the Authority] was not required to provide opportunity to cure in Section 11(a)(3). A clear reading of the [Agreement] does, however, require written notice.

\* \* \*

13. Paragraph 30 clearly and unambiguously provides that all notices are to be in writing. This court finds that Paragraph 30 required [the Authority] to provide written notice of [Evergreen]'s default.

14. The evidence established that [the Authority] advised and informed [Evergreen] of the issues that resulted from their ash on several occasions. **See** Exhibit P-8, Exhibit P-9 [(Email exchanges between the parties)].

15. While the [email] notice provided by [the Authority] was in writing, it did not comport with Paragraph 30 of the [Agreement]. It is not the task of this court to rewrite the [Agreement] of the parties.

16. As set forth above, this [c]ourt does find that [the Authority] was required to provide written notice to [Evergreen].

On March 5, 2021, the court entered a Decision finding: (1) in favor of the Authority and against Evergreen on the Authority's complaint for breach of contract for Evergreen's failure to make payments of monies due and entered judgment in the amount of $104,525.20; and (2) in favor of Evergreen and against the Authority on Evergreen's breach of contract counterclaim for the Authority's failure to provide written notice of Evergreen's delivery of Prohibited Waste, but awarded Evergreen zero damages because Paragraph 26 of the Agreement precluded Evergreen from recovering indirect, consequential, exemplary, special, incidental or punitive damages. The court denied post-trial motions and Evergreen timely appealed.[4] It filed a statement of errors complained of on appeal pursuant to Rule 1925. *See* Pa.R.A.P. 1925(b).

_____

[4] Our standard of review of this matter is well-settled.

> Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review[,] the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

***Woullard v. Sanner Concrete & Supply***, 241 A.3d 1200, 1207 (Pa. Super. 2020) (citation omitted).

## II.

### A. Evergreen's Breach of Contract

Although Evergreen does not dispute that it failed to pay invoices totaling $104,525.20., it claims that the trial court erred and/or abused its discretion when it:  (1) found that Evergreen breached Paragraph 11(a)(1) of the Agreement since the Authority breached Paragraphs 11(a)(1), 11(b) and 30 by failing to send written notices of Evergreen's failure to pay overdue invoices and Event of Default; (2) failed to find that the Authority anticipatorily breached the Agreement by refusing ash delivery; (3) failed to find that Evergreen's obligation to pay the Authority ceased upon the Authority's material breach of the Agreement under both Pennsylvania law and Paragraph 10; and (4) failed to find that Evergreen's obligation to pay ended within thirty days of it sending notice of default to the Authority for its refusal of ash deliveries.

It is long settled that pursuant to Common Law, to establish an action in breach of contract, a party must prove (1) the existence of a contract and its essential terms, (2) a breach thereof, and (3) resulting damages.  **See Hart v. Arnold**, 884 A.2d 316, 332 (Pa. Super. 2005), *appeal denied*, 897 A.2d 458 (Pa. 2006).

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.  The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself.  The whole instrument must be taken together in arriving at contractual intent.  Courts do not assume that a contract's

language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Id.* (citations omitted).

When performance of a duty under a contract is due, any nonperformance is a breach. If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract. If, however, the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective.

*Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. 2003) (case citations omitted).

Here, the essential intent of the parties was that the Authority would accept Evergreen's ash delivery, and, in return, Evergreen would pay them $28.75 per ton within thirty days receipt of the monthly invoice. (*See* Agreement, at ¶¶ 1, 3(a), 4).

The record reflects that on February 29, 2012, the Authority sent a monthly invoice to Evergreen at Evergreen Community Power, 720 Laurel Street, Reading, PA 19602 reflecting a balance due of $67,136.98. (*See* N.T. Trial, 9/25/20, at 6, Exhibit P-2). On March 31, 2016, the Authority sent Evergreen an invoice listing total current charges as $37,388.22, with a past due amount of $67,136.98, for a total balance due of $104,525.20. (*See* Exhibit P-3). Payment was due on April 30, 2016. The Authority filed its complaint in September 2016, approximately four months after the due date. Evergreen stipulated that it has not tendered this payment at any time.

Based on the unambiguous language, Evergreen breached a material term of the Agreement by failing to pay the invoices resulting from the Authority's services. Although it provides arguments for why the Authority's actions failed to comply with various provisions of the Agreement, the fact is that it got the benefit for which it bargained and owes fees for that realized service, and none of its arguments to the contrary would compel a different result. However, for the sake of providing a thorough review, we will address the merits of Evergreen's arguments.

**B.**

Evergreen argues that the trial court erred in concluding it breached Paragraph 11(a)(1) of the Agreement because the Authority failed to provide notice of overdue fees or Events of Default for non-payment pursuant to Paragraphs 11(b) and 30. (**See** Evergreen's Brief, at 13-17).

The Agreement provides that the "[f]ailure by [Evergreen] to make payment of an overdue fee within ten (10) days following receipt of written notice" is an Event of Default for which the Authority "shall have the right upon prior notice to [Evergreen] to: (a) terminate or suspend its obligation under this Agreement; and/or (b) pursue all remedies available to it at law or in equity." (**Id.** at 11(a)(1), (b)). Paragraph 30 provided, in pertinent part, that "all notices required by the Agreement shall be in writing and shall be mailed by first class mail, postage prepaid to … Stephen Simmons, Fuel

Manager Evergreen Community Power, 800 South Street, Reading, PA 19602." (***Id.*** at 30).

The trial court found that the Authority was required to provide written notice of the past due balance and that it did so by mailing the written invoices. (***See*** Decision, at ¶¶ 4-7, 10, 13, 23). Evergreen argues that this was error, and that the Authority breached the Agreement by failing to send separate notices by first-class mail pursuant to Paragraphs 11(a)(1), (b) and 30 and, therefore, was prohibited from recovering the $104,525.20 due. We disagree. Pursuant to the Agreement, Evergreen delivered the waste ash to the Landfill, and the Authority put them on notice via written invoices of the amounts due and past due for the ash deliveries. Any failure to mail a separate notice apprising Evergreen that it owed the money was not material, particularly where Evergreen was on actual notice and had received the benefit of delivering its ash to the Landfill and the Authority accepting it.

Hence, Evergreen's claim that the court erred and/or abused its discretion in finding that the Authority did not materially breach the Agreement by failing to comply with the technical requirements of Paragraphs 11(a)(1), (b) and 30[5] lacks merit and does not support Evergreen's claim that it was not required to pay the past due invoices.

_____

[5] We note that the Authority could not comply with all specific mailing requirements of Paragraph 30 where the named recipient for Evergreen was no longer employed by the LLC.

**C.**

Evergreen argues next that the trial court erred in failing to find that its obligation to pay outstanding invoices ceased on March 31, 2016, upon the Authority's breach of Paragraph 10(a)(2) of the Agreement by refusing to accept delivery of the waste ash disposal on March 16, 2016. (**See** Evergreen's Brief, at 17, 20, 23). It also maintains that the Authority failed to provide Evergreen with the proper notice of any alleged Prohibited Waste and an opportunity to cure pursuant to Paragraph 11(a)(2). (**See id.** at 21-22). The Authority responds that it did not breach the Agreement by not accepting Evergreen's ash delivery because it was Prohibited Waste of which Evergreen was on actual notice and unable to cure. (**See** The Authority's Brief, at 29-32).

Pursuant to the Agreement, "[f]ailure by [the Authority] for a period of fifteen (15) consecutive days to accept delivery of waste at LANDFILL substantially in accordance with the terms and conditions of this Agreement" constitutes an Event of Default. (Agreement, at ¶ 10(a)(2)). Evergreen's delivery of Prohibited Waste on a repeated basis followed by a failure "to cure within a reasonable period following written notice from [the Authority]" shall constitute an Event of Default." (Agreement, at ¶ 11(a)2). "Prohibited Waste" is defined, in pertinent part, as "any [] material the [Authority] reasonably concludes would require special handling or present an endangerment to

LANDFILL, the public health or safety, or the environment." (Agreement, at ¶ 7).

Under Pennsylvania law, anticipatory repudiation or breach requires an "absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (Pa. 2015) (citation and internal quotation marks omitted). However, "[a] party who cannot perform its own obligations under a contract is not entitled to collect damages." *Nikole, Inc. v. Klinger*, 603 A.2d 587, 593-94 (Pa. Super. 1992).

Here, the trial court found that,

> To establish that an anticipatory breach of [the Agreement] had occurred under the circumstances of this case, [Evergreen] was required to prove: (1) that [the Authority] clearly and positively indicated, by words or conduct, that they would not or could not accept [Evergreen]'s ash and therefore would breach their contract; and (2) [Evergreen] would have been able to deliver their ash under the [Agreement].
>
> Under the circumstances of this case, even assuming *arguendo* that [the Authority] clearly and positively indicated that they would no longer accept deliveries of waste at the landfill in breach of Paragraph 10(a)(2), satisfying the first prong of the test laid out above, [Evergreen] did not satisfy the second prong, because they themselves were in breach of Paragraph 11(a)(2) by consistently delivering Prohibited Waste to the landfill. Accordingly, they would not have been able to fulfill their own obligations under the [Agreement].[6]

---

[6] Evergreen argues that the trial court erroneously stated in its Rule 1925(a) opinion that Evergreen violated Paragraph 11(a)(2) because there is no contemplation that dust particles could be Prohibited Waste, it attempted to mitigate and it was delivering the same ash as it had before. (*See* Evergreen's
*(Footnote Continued Next Page)*

When a party to a contract seeks to enforce the agreement or recover damages for breach of that agreement, that party must prove that he has performed all of his own obligations under the contract. *Nikole, Inc.*[, *supra* at 593]. In the case *sub judice*, [Evergreen] did not prove that it performed all the obligations under the [Agreement] owed to [the Authority].

While this court did find [the Authority] failed to provide written notice of [Evergreen]'s default pursuant to Paragraph 10(a)(2) …, that does not negate the fact that [Evergreen] was in breach of the [Agreement] themselves for failing to comply with Paragraph 11[(a)(2)] [(re: Delivery of Prohibited Waste).]

(Trial Ct. Op., at 17-18). We agree with the trial court's reasoning.

The evidence at trial was that Evergreen was aware since February 2016 via phone calls, emails and in-person meetings that the Authority was unhappy with the ash being delivered to the Landfill, and that Evergreen was given multiple opportunities over approximately forty days to correct the employee health and equipment problems. (*See* N.T. Trial, 9/25/20, at 53, 56, 62-64, 74-75, 97-99, 101-04, 111-19, 130-31, 167-68, 200-02, 234-36, 250); (N.T. Trial, 11/18/20, at 8, 49, 56); (Exhibits P-8, P-9). Although

---

Brief, at 25-33). However, as stated, there was extensive testimony that the Authority determined that the ash either required special handling or presented a health or safety issue, thus making it Prohibited Waste that Evergreen was unable to cure after the Authority notified it. (*See* Agreement, at ¶ 7). Further, the argument regarding the previous delivery of the ash sounds in waiver, which is not meritorious under the express language of the Agreement. (*See id.* at ¶ 27) (Failure by the Authority "to take any action with respect to any default or violation by [Evergreen] … shall not, in any way, limit, prejudice, diminish or constitute a waiver of any right to act with respect to any … subsequent violation ….").

Evergreen employees stated that they added water to the ash, in mid-March, it was as "dry as ever," and Evergreen witnesses could not remember trying any other solution. (*See* N.T. Trial, 9/25/20, at 49, 52-53, 56-57, 62-63, 75, 101-02, 109, 113, 122, 126-27, 173, 222); (Exhibit P-9). Evergreen was unable to cure the defective ash to the Authority's satisfaction at any time. (*See* N.T. Trial, 9/25/20, at 55, 202).

Evergreen was on actual notice that it was delivering Prohibited Ash in violation of the Agreement. Pursuant to the Agreement's terms, the Authority had the right not to accept Prohibited Waste and Evergreen was prohibited from delivering it. The trial court found that where Evergreen was aware that it was delivering Prohibited Waste, it was in breach of the Agreement itself and was unable to comply with its terms by delivering acceptable ash to the Landfill. Hence, the Authority did not anticipatorily breach the Argument by refusing waste ash without providing written notice.

### D.

Evergreen also argues that its obligations ended on April 15, 2016, pursuant to Paragraph 10(a)(3) because on March 17, 2016, and March 28, 2016, it sent notice of termination to the Authority due to its refusal to accept waste ash. (*See* Evergreen's Brief, at 24-25).

Pursuant to Paragraph 10(a)(3), the Authority's "breach of, or failure to comply with, any material term … contained in this Agreement" is an Event of Default for which Evergreen had the right to terminate/suspend its obligations

or pursue a legal remedy upon prior notice. (Agreement, at ¶ 10(b)); (**see id.** at ¶ 10(b)).

However, as stated previously, the Authority was not in breach of the Agreement since Evergreen had actual notice that it was delivering Prohibited Waste to the Landfill and was unable to cure it. The Authority had the right to refuse these deliveries and Evergreen had a duty to either treat it or not deliver it. (**See** ¶¶ 7, 8, 11(2)).[7]

_____

[7] Specifically, the Agreement provides:

> 7. In the event that ash is delivered to the LANDFILL that [the Authority] determines to be Prohibited Waste, [the Authority] shall immediately notify [Evergreen] of the nature of the Prohibited Waste …. Any cost of storage, removal or treatment … shall be the borne entirely by [Evergreen]. For the purposes of this Agreement, "Prohibited Waste" means: … any [] material that the [Authority] reasonably concludes would require special handling or present an endangerment to LANDFILL, the public health or safety, or the environment.

> 8. In the event that [Evergreen] fails to remove … the Prohibited Waste from the LANDFILL in accordance with [Authority] Notice, … [the Authority] shall have the right to declare [Evergreen] in default under this Agreement and may institute an action at law or equity for any injury or damage suffered or incurred by [the Authority].

> \* \* \*

> 11.(a)(2) Delivery by [Evergreen] … of any PROHIBITED WASTE pursuant to this Agreement to LANDFILL on a repeated basis followed by repeated failure to [Evergreen] to cure within a reasonable period following written notice from [the Authority] to [Evergreen] of delivery of such PROHIBITED WASTE [is an Event of Default.

*(Footnote Continued Next Page)*

Further, the March letters were not effective terminations because they were not "clear and unambiguous." ***Writ v. Bristol Pat. Leather Co.***, 101 A. 844, 845 (Pa. 1917).

The March 17, 2016 correspondence referenced the Authority's "failure to accept deliveries" and requested that this default be cured. (Correspondence, 3/17/16, at 1). The March 28, 2016 letter stated that the Authority "has informed [Evergreen] that it will no longer accept waste ash deliveries, which is a material failure" and if not cured within thirty days, Evergreen would terminate the Agreement, but hoped the parties "can come to an arrangement to avoid having to terminate the Agreement." (Correspondence, 3/28/16, at 1). These letters did not express a "clear and unambiguous" intent to terminate the Agreement effective immediately.

Finally, even if the Authority was in material breach and Evergreen effectively terminated the Agreement, Paragraph 25 expressly provided that, "Upon termination or expiration of this Agreement, all amounts due from [Evergreen] under the terms of this Agreement shall be due and payable immediately to the [Authority]." (Agreement, at ¶ 25).

---

(Agreement, at ¶¶ 7, 8, 11(a)(2)).

Hence, for all the foregoing reasons, the trial court properly found that Evergreen breached the Agreement by failing to pay the overdue invoices in the total amount of $104,525.20.

## III.

Evergreen argues that the trial court erred in denying damages based on Paragraph 26, Limitation of Liability, for its breach of contract claim against the Authority for not providing formal notice before refusing ash deliveries. (**See** Evergreen's Brief, at 34-42). It maintains that its damages were direct, not consequential, and that it was entitled to pursue them. (**See id.**).[8]

Generally, in contract cases, damages are comprised of "the loss in the value to [the non-breaching party] of the other party's performance caused by its failure or deficiency" (direct damages), plus "any other loss, including incidental or consequential loss, caused by the breach[.]" **Douglass v. Licciardi Cons. Co., Inc.**, 562 A.2d 913, 915 (Pa. Super. 1989) (citing Restatement (Second) of Contracts, § 347).

---

[8] "In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." **Delahanty v. First Pennsylvania Bank**, 464 A.2d 1243, 1257 (Pa. Super. 1983). Evergreen relies on unpublished, non-binding Federal law to urge this Court to apply an error of law standard of review. (**See** Evergreen's Brief, at 34-35). However, not only does this law lack binding precedential value, but it also conflicts with long-standing precedent in Pennsylvania. Therefore, we are not legally persuaded by Evergreen's argument in this regard.

Pursuant to Paragraph 26, Limitation of Liability, the parties expressly waived any consequential damages:

> Unless provided otherwise in this Agreement, neither party shall be liable to the other for any indirect, consequential, exemplary, special, incidental or punitive damages, including without limitation loss of use or lost business, revenue, profits, or goodwill, arising in connection with this Agreement, under any theory of … contract … even if the party knew or should have known of such damages.

(Agreement, at ¶ 25).

The trial court found that the Authority breached the Agreement by failing to provide Evergreen with formal written notice pursuant to Paragraph 30 for its default due to delivering Prohibited Waste. The court did **not** conclude that the Authority breached the contract by refusing delivery of the Prohibited Waste, but only for failing to provide notice pursuant to Paragraph 30 before it did so. (**See** Decision, Conclusions of Law, at ¶¶ 8-16). In fact, it concluded:

> Our review of the record confirms that there were no direct damages suffered due to the Authority's failure to provide notice that Evergreen was in default because it was delivering Prohibited Waste. As stated elsewhere in this Memorandum, the Authority advised Evergreen via phone calls, emails and in meetings that its waste ash was causing health problems for its employees and issues to its equipment and Evergreen was unable to cure the problems between the time of the parties' February 5, 2016 meeting and the Authority advising it on March 16, 2016 that it would no longer accept the ash without prior authorization, because it considered it Prohibited Waste.
>
> Based on the foregoing, any damages were not foreseeable based on the Authority's failure to provide written notice pursuant to Paragraph 30,

- 25 -

particularly where the Authority did not terminate the Agreement, but only required that any further deliveries of ash would have to be approved before being accepted. Further, we cannot find that the trial court's decision to find that the damages were consequential and barred by Paragraph 25 to be the result of partiality, caprice, prejudice, corruption or some other improper influence."[9] **Delahanty**, **supra** at 1257. Evergreen's issue lacks merit.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2022

---

[9] The trial court previously observed that Evergreen could not recover damages because, even though it found the Authority breached the Agreement for failing to provide formal notice, Evergreen also was in breach for delivering Prohibited Waste that it was unable to cure. (**See** Trial Ct. Op., at 17-18); (Memorandum **supra** at 18-19). Therefore, even if the court had not found the damages to be circumstantial, Evergreen would be precluded from realizing them where it was unable to perform its own obligations by remedying the health and safety problems caused by the waste ash. **See Nikole, Inc.**, **supra** at 593-94.